*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0083P (6th Cir.)
File Name: 00a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MCMAHAN & COMPANY,
  *Plaintiff-Appellant,*

   *v.*

PO FOLKS, INC.,
  *Defendant-Appellee,*

TRADITIONAL BANK,
INCORPORATED f/k/a
MONTGOMERY TRADERS
BANK & TRUST COMPANY,
  *Garnishee-Appellee.*

No. 99-5012



Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 95-00342—Karl S. Forester, District Judge.

Argued: January 28, 2000

Decided and Filed: March 8, 2000

Before: SUHRHEINRICH and GILMAN, Circuit Judges;
COHN, District Judge.*

---

 *The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**COUNSEL**

**ARGUED:** Leigh R. Isaacs, ISAACS & EVANS, New York, New York, for Appellant.  Alan B. Peck, WHITE, PECK, CARRINGTON, WILLIAMS & NEAL, Mt. Sterling, Kentucky, for Appellees.  **ON BRIEF:**  Leigh R. Isaacs, ISAACS & EVANS, New York, New York,  Denise H. McClelland, FROST & JACOBS, Lexington, Kentucky, for Appellant.  Alan B. Peck, WHITE, PECK, CARRINGTON, WILLIAMS & NEAL, Mt. Sterling, Kentucky, for Appellees.

_____

**OPINION**
_____

COHN, District Judge.

### I. Introduction and Facts

This is an action to enforce a judgment.  Plaintiff-Appellant McMahan & Co. (McMahan) appeals the district court's grant of summary judgment for Defendant-Appellees Po Folks, Inc. (Po Folks) and Montgomery Traders Bank & Trust Co., now known as Traditional Bank, Inc. (Bank).

#### A.

On February 28, 1995, McMahan obtained a default judgment in the United States District Court of Delaware against Po Folks for failure to pay on a promissory note given to McMahan.  The judgment, in the amount of $288,763.14 (including interest), was registered in the United States District Court for the Eastern District of Kentucky on April 3, 1995. McMahan thereafter attempted to enforce its judgment through more than twenty garnishment orders issued to the Bank, at which Po Folks maintained accounts.  However, McMahan's efforts were largely unsuccessful, with less than $12,000 being remitted to McMahan by the Bank.

McMahan therefore moved for a writ of execution, attachment and/or sequestration against Po Folks' property held by the Bank, as is the standard procedure to challenge a bank's garnishment disclosure in Kentucky.  *See* KY. REV. STAT. ANN. § 425.526; *see also* FED. R. CIV. P. 69 (a) (federal garnishments are to proceed according to the laws of the state in which the federal court sits).  The district court denied McMahan's motion, finding that the Bank did not possess any Po Folks property on the date and the time the garnishment orders were received.[1]  On appeal, we reversed the district court's decision and ordered that discovery be conducted. *McMahan & Co. v. Po Folks, Inc.* 1997 WL 78497 (6th Cir. Feb. 24, 1997).

On remand, discovery revealed that the reason the Bank did not satisfy the garnishment orders served by McMahan was because of the internal procedures of the Bank, and the structure of Po Folks' accounts.  Po Folks had several accounts with the Bank, specifically, a general account and 5 independent, named accounts.  The named accounts were "zero balance" accounts, which meant that at the close of business every day, the account funds would be "swept" into the general account, leaving a zero balance.  Po Folks paid the Bank a monthly fee to allow Po Folks to significantly overdraw on its general account.[2]  When a garnishment order was served, the Bank's policy was to check the balance of the account by computer, which only reflected the account balances as of the close of business the previous day and did not show any deposits or withdrawals made during the day the garnishment orders were served.  Thus, since all of Po Folks' accounts were either "zero balance" accounts, or overdrawn as of the close of business the preceding day, whenever a garnishment order was served the Bank would respond that no

---

[1]As the losing party, the district court held McMahan responsible for paying the fees of an independent expert appointed by the district court to conduct an independent review of the accounts in question.

[2]The propriety of such practice is not explained in the record.  The effect of such procedure appears to be no more than a demand obligation.

monies were in Po Folks' account, even if deposits had been made the day that the garnishment order was served, and particularly that part of the day preceding the exact time the garnishment order was served.

## B.

Following the completion of discovery, McMahan again moved for writs of execution, attachment and/or sequestration against Po Folks' property, an order of contempt against the Bank, and summary judgment. The district court found that due to the Bank's procedures and the structure of Po Folks' accounts, the Bank did not hold property belonging to Po Folks as of the dates and times the garnishment orders were served, and further, that the Bank did not intentionally manipulate the account balances in order to assist Po Folks in defeating garnishment orders. The district court additionally held that it would be too burdensome on Kentucky banks to take steps "outside of the ordinary course of business" to facilitate the determination of whether they are in possession of garnished property as of the dates and times the garnishment orders were served. Accordingly, it denied McMahan's motion for a writ of execution and, in turn, denied "as moot" both parties' summary judgment motions.

## II. Summary of Arguments

This is a case of first impression under Kentucy law. McMahan argues on appeal that the Bank had an obligation to determine whether it was in possession of Po Folks' property as of the date and time of service of a garnishment order and since it failed to do so, it violated the garnishment orders and as such, is liable to McMahan. McMahan says that the Bank cannot aggregate the balances of all of Po Folks' accounts for purposes of determining its obligations on the garnishment orders because the district court found that the named accounts were not sub-accounts of the general account.

The Bank responds that the district court correctly found that the Bank did not violate the garnishment orders by stating it owed no money and correctly refused to require the Bank to

consistent with this opinion, including a determination and order regarding the amount of prejudgment interest and attorney's fees.

## V. Prejudgment Interest and Award of Attorney Fees

### A.

McMahan also asserts that it is entitled to prejudgment interest. Under Kentucky law, prejudgment interest follows a liquidated claim even if the refusal to pay is based upon "good faith denial of liability." *Hale v. Life Ins. Co. of North America*, 795 F.2d 22, 24 (6th Cir. 1986). A claim is liquidated if the amount has been agreed to by the parties or is fixed by operation of law. *See id.* at 24. Here, McMahan's claim is liquidated since the amount of the judgment and each garnishment order was a fixed sum. Accordingly, McMahan is entitled to prejudgment interest.

### B.

Additionally, under FED. R. CIV. P. 70, a party may be held in civil contempt for violating a garnishment order. The primary purpose of a civil contempt order is to "compel obedience to a court order and compensate for injuries caused by non-compliance." *TWM Manuf. Co. v. Dura Corp.*, 722 F.2d 1261 (6th Cir. 1983). We have previously recognized that an award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated. *See Redken Lab., Inc. v. Levin*, 843 F.2d 226 (6th Cir. 1987). Here, an award of attorney's fees is warranted because McMahan was forced to expend a significant amount of money in attorney's fees to recover monies clearly owed to it; an undertaking that was made arduous solely through the conduct of Po Folks' and the Bank.

Furthermore, as the unsuccessful parties, the Bank and Po Folks are also responsible for the court appointed expert's fees and McMahan is entitled to reimbursement in the amount of $6,783.82.

## VI. Conclusion

For the reasons stated above, we REVERSE the district court's decision and REMAND for further proceedings

determine account balances outside of the normal course of business, *i.e.* except as of the close of business the day before the garnishment orders were served.

For the reasons that follow, the decision of the district court is REVERSED.

## III. Violation of Garnishment Orders

At the heart of this dispute is the issue of whether the Bank possessed any property belonging to Po Folks on the dates and times the garnishment orders were served. The district court answered in the negative, and all of its subsequent holdings flow from this holding. Thus, we must address this threshold issue with great care. We review *de novo* the district court's denial of summary judgment. *See* FED. R. CIV. P. 56, *Smith v. Ameritech*, 129 F.3d 857 (6th Cir. 1997).

### A.

The district court found that the Bank did not "hold property belonging to, nor was it indebted to, Po Folks" on the dates and times the garnishment orders were served. Opinion and Order filed December 9, 1998 (Opinion and Order) at 6. It noted that the Bank's policy for processing a garnishment order solely utilized the Bank's computers to determine if a customer had funds subject to the garnishment order. Although it recognized that the Bank's computers at all times reflected only the account balance from the close of business the previous day, the district court decided that requiring the Bank to do anything else beyond a computer check would require the Bank to go "outside the ordinary course of business" and it was unwilling "to impose such a burden." Opinion and Order at 6. We disagree.

#### 1.

The Kentucky garnishment statute, KY. REV. STAT. ANN. § 425.501(5) provides that "[i]f the court finds the garnishee was, at the time of the service of the order upon him, possessed of any property of the judgment debtor, . . . the

court shall order the property or the proceeds of the debt applied upon the judgment."   In our prior opinion, we characterized the Kentucky statute as effecting a "snapshot" rule, operating only on property that the garnishee possessed at the time the garnishment order was served and does not operate in the future.

The district court's opinion focused on the fact that the Bank, in following their ordinary garnishment procedures, could not have discovered property belonging to Po Folks, absent "manually processing all items on hand at that particular moment."   The district court therefore concluded that since the Bank could not *locate* Po Folks' property in the "ordinary course of business," it did not *possess* any of Po Folks' property.   Nowhere in the statute does it say that locating garnished property is required only if it can be done in the "ordinary course of business"[3] or without being unduly burdensome.

### 2.

Moreover, even assuming that such a requirement exists, the record reflects that the Bank had the ability to locate property belonging to Po Folks in the "ordinary course of business."   Although the Bank was unable to view a current daily account balance from the computer terminals since the computer always had a one day lag, several Bank employees testified that it was common practice, in a number of situations including garnishments, for the Bank to place a "hold" on an account for up to 14 days.  *See* JA pp. 354-5, 360-362. A "hold" prevents any withdrawals or deposits from the account until it is lifted.   If the Bank had placed a "hold"

---

[3]The district court relied too heavily on dicta found in the concurrence to our previous decision which states that "if during the business day on which a garnishment was served the customer's accounts would have shown a net positive balance in the ordinary course of business, then the plaintiff should have been entitled to recover that balance." *McMahan*, 1997 WL 78497 at *5.  Not only was this language dicta, but the Bank has proffered no authority for such a proposition.

581-2.   Second, the Bank delayed paying the first two garnishment orders for two years.

Although, as noted by the district court, none of this evidence conclusively establishes that "the Bank intentionally manipulated Po Folks' accounts in order to defeat garnishment," the Bank had an independent duty to refrain from conduct that would obstruct enforcement of the judgment.  *See Board of Regents v. Harriman*, 857 S.W. 2d 445 (Mo. Ct. App. 1993).  As the court in *Harriman* stated:

> It is the duty of a garnishee to stand neutral in the litigation over the fund in his hands, to disclose all the information it has concerning the fund to the court, and to hold the fund in readiness to abide by the decision of the court. When he follows this course, he is entitled to the fullest protection; but when the garnishee   . . . abandons his position as stakeholder and takes up the role of a litigant . . . he must be content to accept the outcome of the battle fought out on the field he has chosen.

*Id.* at 451 (citing *Potter v. Whitten*, 155 S.W. 80, 88 (Mo. Ct. App. 1913); Restatement (Second) of Judgments §§ 63 comment a (1982)).

Thus, in light of the Bank's conduct in changing the non-"zero balance" account with the knowledge of Po Folks' motivation, coupled with the Bank's own garnishment procedures, and the fact that Po Folks was the Bank's largest customer, we believe that a genuine issue of material fact exists as to whether the Bank breached its duty to remain neutral and actively assisted Po Folks in evading garnishment of its property.  However, having already found that the Bank is liable for the full amounts of the garnishment orders, *supra*, this issue is of no practical significance.

exact time the deposits or debits occurred does not relieve the Bank of liability. In fact, the general rule is that "[w]here relevant information . . . is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it." *Weeks v. ARA Serv.*, 869 F. Supp. 194, 195 (S.D.N.Y. 1994). In *Wilton Enterprise v. Cook's Pantry*, 552 A.2d 1031 (N.J. 1988), the garnishee bank claimed that it did not know the time a certain check was paid on the date a garnishment order was served. The court held that "absent any specific proof of the exact time of payment of the check by the bank, a permissible inference can and shall be drawn that final payment of the check occurred after the levy was served. . . ." *Id.* at 1034. We agree and find this situation analogous. Thus, we hold that the Bank is liable to McMahan for the entire amount of the judgment.

### IV. Intentional Manipulation of Accounts

McMahan next argues that the district court erred in dismissing its claim that the Bank intentionally manipulated Po Folks' accounts to avoid garnishment. We agree.

### A.

In dismissing McMahan's claim for intentional manipulation, the district court noted that the "zero balance" structure of Po Folks' accounts had been in place for approximately one year before any of the garnishment orders were served, and concluded that this precluded any manipulation on the part of the Bank to help Po Folks' avoid garnishment. However, there is additional evidence that bears on this determination as well. First, although most of Po Folks' accounts were structured as "zero-balance" prior to any garnishment orders were served, immediately after the receipt of the first two garnishment orders, the Bank acquiesced to Po Folks' request that the Bank change its only non-"zero balance" account to a "zero balance" account, with the understanding that such a change was being made to prevent any further garnishment orders from being honored. *See* JA

on any of Po Folks' accounts for even 24 hours, which the Bank was able to do, the Bank would have been able to process the deposits and debits received prior to the hold in its normal procedure, and ascertained if there was any surplusage the next day.

In *Fast Food Sys., Inc. v. Ducotey*, 837 P.2d 910 (Okla. 1992), the Oklahoma Supreme Court was also faced with a "snapshot" statute and a garnishee bank whose computers did not instantly reflect credits and debits. A bank customer deposited a check for over $8,000.00, and less than two hours later, a garnishment order was served on the customer's account. *See id.* at 911. Because the computer did not yet reflect the check, the bank denied that it had any of the customer's monies. *See id.* The court ruled against the bank, holding that "a bank customer has sufficient property right in any check the customer deposits to his bank account to require the bank to account for it in its answer to a garnishee summons. This is so even if the bank's computer records do not reflect the deposit when the bank receives the garnishment summons." *Id.* at 913. The court in *Fast Food* noted that the bank would routinely suspend processing on accounts subject to garnishments for 24 hours to allow time to identify transactions that may have occurred previously. *See id.* This allowed the bank to learn the exact balance of the account at the moment the bank was served with a garnishee summons.

### 3.

We agree with the reasoning of the Oklahoma Supreme Court and hold that the Bank had an obligation to determine whether on the date *and time* a garnishment order was served it possessed any property belonging to Po Folks. *See* KY. REV. STAT. ANN. § 425.501(5). Merely checking a computer record, known to reflect only the balance from the end of business the previous day, is insufficient under the "snapshot" requirement of the Kentucky statute which mandates that property be identified as of the moment that the garnishment order is presented, not merely as of close of business the previous day. *See id.* ("If the court finds that the garnishee

was, *at the time* of service of the order upon him, possessed of any property. . . .")

If this means that banks must all implement time-stamping into their business procedures, or freeze an account subject to a garnishment order to meet this requirement, then so it does. A holding any other way would create an exception to KY. REV. STAT. ANN. § 425.501(5) allowing a garnishee to avoid the operation of a garnishment order by mirroring the account structure created for Po Folks and reward sloppy accounting and garnishment procedures.

Additionally, from a policy standpoint, the rule is sound. As this case illustrates, much can occur in one day and to allow banks to rely solely on information from the close of business the previous day can lead to misleading inaccuracies. Furthermore, by structuring its accounts in this fashion, although perhaps completely legal from a banking standpoint,[4] Po Folks took advantage of the Bank's internal procedures to effectively evade virtually all garnishment of its property,[5] yet still maintain all of the benefits of the deposits. Fundamental fairness does not permit such a result.

Moreover, what the statute requires is not an unreasonable burden on the Bank because, as was testified to by an employee of the Bank, the Bank generally receives only approximately 6 garnishment orders a month, and putting a "hold" on an account is routinely done in numerous contexts.

---

[4]We express no comment on the legality of an account structure such as here.

[5]For example, although McMahan successfully garnished $5,660.37 on April 4-5, 1995 from Po Folks' MTS-01 account, immediately after the garnishment Po Folks changed the MTS-01 account to a "zero balance" account.

### B.

In light of the above, we conclude that the Bank violated the garnishment orders if they were returned unsatisfied when any of Po Folks' accounts showed a positive net balance at the time of service.[6]  Under Kentucky law, a violation of a garnishment order imposes liability in the amount of the judgment. *See Holbrook v. Fyffe*, 175 S.W. 977 (Ky. 1915).

### 1.

With respect to the Credit Card account, the Bank admitted that deposits were made  every morning before the bank opened. *See* JA at 534.  Credits in the form of credit card payments, and debits in the form of checks were electronically transmitted to the Bank and processed between 9:00-10:00 a.m. every morning. *See* JA at 534.  The Bank's employee, Mr. Baker, testified that on the dates of 17 garnishment orders, the Credit Card account, after subtracting the debits, yielded a surplusage of $114,830.16.[7]  This fact effectively eliminates the Bank's argument that it did not possess any property of Po Folks' prior to the dates and times the garnishment orders were served since the garnishments were obviously not served until the bank opened and by then, the electronic transfer amounts were already sitting in the Credit Card account.

### 2.

As to Po Folks' other accounts, the Bank admits that it has no way of determining at what time the deposits or debits occurred because it did not time-stamp any of them. Contrary to the Bank's argument, the absence of specific proof of the

---

[6]The court appointed expert's report did not indicate whether at the *time* the garnishment orders were served, any of Po Folks' accounts may have had a positive balance.

[7]Prior to being "swept" into the general account, as per the "zero" account structure.