**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0076n.06**
**Filed: January 31, 2007**

**No. 06-5554**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TRAVELERS CASUALTY & SURETY CO., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| WHITEHOUSE-FRANKLIN, L.L.C., et al., | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF KENTUCKY |
| Defendants, | ) | |
| | ) | |
| PREVENTATIVE MAINTENANCE & | ) | |
| CONTROL, L.L.C., | ) | |
| | ) | |
| Intervenor-Appellant. | ) | |

Before: SUHRHEINRICH, SUTTON and MCKEAGUE, Circuit Judges.

SUTTON, Circuit Judge. Preventative Maintenance and Control, L.L.C. ("PMC") challenges the district court's refusal to permit it to set aside a garnishment by Travelers Casualty & Surety Co. of proceeds it received from the sales of several securities. Because PMC never received transferable rights to the stock at issue—because the earlier owners never transferred the stock to PMC by endorsing the stock certificates—we affirm.

I.

On April 19, 2005, Travelers obtained a $1,388,351 judgment against Alfred Carpenter and several business entities that Carpenter controlled, including Trinity Development Company, a Kentucky S-corporation owned in equal shares by Carpenter and his wife. Carpenter also owns a 30% stake in PMC, a company founded by Carpenter's brother-in-law.

Seeking to collect on its judgment from Carpenter and Trinity, Travelers sought to garnish the proceeds from the sale of 5070 shares of stock. The question is whether Carpenter (and Trinity) had transferred ownership of the stock at the time of the garnishment—an inquiry that requires us to look at three securities transactions.

The first transaction occurred on January 1, 2003. Trinity purported to sell 4447 shares of Peoples Bancorp stock and 501 shares of Hopfed Bancorp stock to PMC for $118,605.47. The parties memorialized the sale in a written agreement, which included a provision stating that Trinity would "deliver to PMC stock certificates in general endorsed fashion which [would] allow[] PMC to have such investments transferred into its name." JA 112. Despite this provision, Carpenter never endorsed the stock certificates or otherwise transferred them into PMC's name. Instead, Carpenter placed the certificates in a file cabinet in his Florida home office where he maintained PMC's records for his brother-in-law, Don Miller. Carpenter kept the records for Trinity in the same file cabinet but in a different drawer.

During the nearly two-and-a-half years between the stock sale and Travelers' garnishment action, the dividend checks that Carpenter received from the shares all arrived bearing Trinity's name. Carpenter says he deposited the dividend checks in Trinity's bank account, then immediately wrote checks payable to PMC for the dividend amounts, which he deposited in PMC's bank account.

The second transaction took place on December 1, 2003. Carpenter entered into a written agreement with PMC—at the time wholly owned by Miller—to purchase a 30% interest in PMC in exchange for $259,000 cash and 122 shares of Prudential Financial Corporation common stock. Paragraph 5 of the agreement said that "[t]he Parties . . . will take all reasonable and appropriate action, including the execution of appropriate documentation and the filing of appropriate documents, to evidence the transaction." JA 115. Carpenter, however, neither endorsed the stock nor sent it to Miller. Instead, he placed a copy of the signed agreement, along with the stock certificates, in the file drawer containing PMC documents in his Florida home.

On March 15, 2005, Carpenter executed the third agreement, a "Securities Deposit, Transfer and Sale Agreement." Signed by Carpenter (once on behalf of Trinity; once on behalf of PMC), this agreement purported to establish a trust providing for the Peoples Bancorp, Hopfed Bancorp and Prudential stock to be placed into Trinity's brokerage account with Hilliard Lyons (a brokerage firm) and sold on PMC's behalf for a 0.5% fee. Carpenter used this trust arrangement, he later explained, because he had difficulty obtaining the signature guarantees needed to transfer the stock to PMC and "because PMC did not have a brokerage account and time was of the essence in selling the securities in order for PMC to fund a real estate purchase." JA 109. Although the document recited that "each

- 3 -

of the [stock] certificates . . . [has] the stock power and transfer sections on the back sides . . . fully executed by either Trinity or Alfred K. Carpenter," JA 117, Carpenter did not endorse the certificates.

Seeking to recover the judgment it had won against Carpenter, Trinity and other Carpenter-operated businesses, Travelers filed an affidavit for a writ of non-wage garnishment against Hilliard Lyons on June 15, 2005, to obtain all property of the judgment debtors in Hilliard Lyons' possession. Travelers filed another garnishment application on June 17. The writ was served on Hilliard Lyons on June 17. On June 16 and 17, Travelers' counsel deposed Carpenter as part of the underlying lawsuit. The next day—a Saturday—Carpenter sent an email to Hilliard Lyons instructing it to sell the stock in Trinity's account. Hilliard Lyons sold the stock on Monday, June 21, 2005. On July 22, Travelers filed a garnishment writ seeking the cash proceeds—$145,086.02—from the sale. Affidavit for Writ of Non-Wage Garnishment, *Travelers Cas. & Sur. Co.*, No. 3:02- CV-110-R (W.D. Ky. 2006) (No. 177).

On June 27, 2005, PMC filed a motion to intervene, noting that the securities at issue "clearly belong to PMC," not to Trinity, and a motion to set aside the garnishment. That same day, Trinity filed an affidavit challenging the garnishment, claiming that the property in Hilliard Lyons' possession "belongs to a third party." Affidavit to Challenge Garnishment, *Travelers Cas. & Sur. Co.*, No. 3:02- CV-110-R (W.D. Ky. 2006) (No. 167). The magistrate judge granted PMC's motion to intervene on September 6. The magistrate judge held a discovery hearing to determine who owned the stock, and thus the proceeds obtained from the sale of it, on the date of

garnishment—Trinity and Carpenter on the one hand or PMC on the other. The magistrate judge ultimately recommended that the district court order Hilliard Lyons to release the proceeds to Travelers and the district court adopted the recommendation.

## II.

To review the bidding: (1) Trinity and Carpenter claim that PMC was a protected purchaser of the Peoples Bancorp, Hopfed Bancorp and Prudential stock and thus Travelers could not garnish the proceeds from the sale of the stock; (2) Travelers contends that Trinity and Carpenter, not PMC, remained the owners of the stock when it garnished the proceeds from the sale of the stock.

We look initially to Kentucky law to determine how the garnishment procedure works. *See* Fed. R. Civ. P. 69 ("The procedure on execution [to enforce a judgment] shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought."). Under Kentucky law, "[i]f the court finds that the garnishee was, at the time of service of the order upon him, possessed of any property of the judgment debtor . . . the court shall order the property or the proceeds of the debt applied upon the judgment." Ky. Rev. Stat. Ann. § 425.501(5). The statute thus establishes a "'snapshot rule,' operating only on property that the garnishee possessed at the time the garnishment order was served," not on property acquired thereafter. *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 630 (6th Cir. 2000); *see also Bank One, Pikesville v. Natural Res. & Envtl. Prot. Cabinet*, 901 S.W.2d 52, 55 (Ky. Ct. App. 1995) ("[T]he

depositor's creditor is not entitled to the money if it is actually owned by somebody else. Instead the somebody else is.") (emphasis omitted).

We look to Florida law to determine who owned what and when because Carpenter, all agree, stored the stock certificates in Florida. *See* Ky. Rev. Stat. Ann. § 355.8-110(3). Having adopted Article 8 of the Uniform Commercial Code, Florida shelters "protected purchasers" of securities from the claims of creditors of the sellers of securities. *See* Fla. Stat. Ann. § 678.3031(1). To qualify as a "protected purchaser" of a security, a party must (1) "[g]ive value," (2) have no "notice of any adverse claim to the security," and (3) [o]btain[] control . . . of the security." *Id.*

PMC satisfies the first requirement. It gave value in exchange for the stock: cash for the Peoples Bancorp and Hopfed shares; an ownership interest in its business for the Prudential shares. *See* Fla. Stat. Ann. § 671.201(44) ("[A] person gives value for rights if he . . . acquires them . . . [g]enerally, in return for any consideration sufficient to support a simple contract.").

We have serious doubts about whether PMC satisfied the second requirement—no notice of an adverse claim. The underlying arbitration award against Carpenter occurred well before these transactions; Carpenter was at various times an agent for Trinity and PMC; and the record contains several suggestions, if not confirmed evidence, that the whole point of these unusual transactions was to avoid Travelers' recovery of these assets.

We need not resolve the point, however, because PMC cannot satisfy the third requirement: It never obtained control of the securities. Under Florida law:

> A purchaser has 'control' of a certificated security in registered form if the certificated security is delivered to the purchaser, and:
>
> (a) The certificate is indorsed to the purchaser or in blank by an effective indorsement; or
>
> (b) The certificate is registered in the name of the purchaser, upon original issue or registration of transfer by the issuer.

Fla. Stat. Ann. § 678.1061(2); *see also id.* § 678.1061 comment 7 ("The key to the control concept is that the purchaser has the ability to have the securities sold or transferred without further action by the transferor."). PMC, we suppose, satisfied the delivery requirement when Carpenter transferred the stock certificates from one drawer in his file cabinet to another. *See* Fla. Stat. Ann. §§ 678.3011(1)(a)–(b) (Delivery "occurs when . . . [t]he purchaser acquires possession of the security certificate [or a]nother person . . . either acquires possession of the security certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges that it holds for the purchaser.").

But it did not satisfy the endorsement requirement. At the time of the garnishment, Carpenter still had not endorsed the stock certificates. Carpenter, it is true, claimed in his affidavit that he supplied the necessary endorsements. But he and PMC later acknowledged that this statement was false. *See, e.g.*, JA 339–40 ("Q: There was nothing on these stock certificates to indicate that they were owned by anyone other than Trinity or yourself, is that correct? [Carpenter]: That's correct."); Br. at 16 ("Had Carpenter signed the backs of the certificates or registered them in PMC's name, he

could have avoided this confusion and the ensuing garnishment challenge. But *the fact that he did neither* does not negate the effectiveness of what was done to transfer ownership. . . .") (emphasis added). Because Carpenter never endorsed the stock certificates, PMC never gained control over them. Nor can Carpenter (or Trinity) supply the endorsements now because Hilliard Lyons already has sold the stock.

Although Carpenter did not endorse the stock certificates themselves, PMC maintains that Carpenter still provided the endorsements necessary to effect a stock transfer. Invoking Florida's definition of "indorsement"—"a signature . . . on a security certificate in registered form *or on a separate document*," Fla. Stat. Ann. § 678.1021(k) (emphasis added)—PMC argues that the signatures on the three written stock-sale agreements amount to endorsements on "separate documents." We do not agree.

Nothing in the three agreements offers any indication that the signatures on the stock-sale agreements were meant to suffice as the required endorsements. And there are several indicators that the parties to the agreements meant no such thing. Plainly, Carpenter, the only sentient figure in these transactions, thought that an endorsement on the stock certificates was required. When he filed his affidavit in this case (at a time when he mistakenly assumed he had endorsed the stock certificates), he stated that Trinity had "endorsed and delivered the [Peoples Bancorp and Hopfed Bancorp] security certificates to PMC *as required by the terms of the Purchase Agreement*." JA 109 (emphasis added); *see id.* (stating that he "transferred ownership of the 122 [shares] of the common stock of Prudential Financial Corporation by endorsing the certificate for the Prudential stock and

delivering it to PMC"). And plainly the companies in which the stock was owned thought that something more was required. They continued to send the dividends to Trinity, not to PMC. The third agreement, which allowed Trinity to put all of the stock into Trinity's Hilliard Lyons account so that it could be sold, removes any doubt about the point. It includes the following recital: "Whereas, each of the certificates of common stock of the Securities *have the stock power and transfer sections on the back sides of such certificates fully executed* by either Trinity or Alfred K. Carpenter." JA 117 (emphasis added). The provision confirms the parties' understanding that the stock certificates themselves would be endorsed.

PMC next argues that Kentucky's snapshot rule precludes Travelers from reaching the stock-sale proceeds—the theory being that PMC owned the stock (along with the proceeds from its sale) at the time Travelers served its garnishment writs. But without the endorsements required to transfer the certificated securities, PMC never owned transferable title to the stock; it remained the property of Carpenter and Trinity. *See* Fla. Stat. Ann. § 678.3041 ("If a security in registered form has been delivered to a purchaser without a necessary indorsement, the purchaser may become a protected purchaser only when the indorsement is supplied."). When Carpenter placed the unendorsed stock certificates in PMC's file drawer, it is true, he triggered PMC's right to demand endorsement, and perhaps triggered other rights that PMC may have against Carpenter. *See* Fla. Stat. Ann. § 678.3041(4) ("[A]gainst a *transferor*, a transfer is complete upon delivery and the purchaser has a specifically enforceable right to have any necessary indorsement supplied.") (emphasis added). But Carpenter did not effect a stock transfer valid as to the rest of the world—including his own (and

Trinity's) judgment creditors. At the time of garnishment, in the final analysis, the stock and its proceeds belonged to Trinity and Carpenter, not to PMC—permitting Travelers to garnish the proceeds in partial satisfaction of its judgment against Carpenter and his businesses.

IV.

For these reasons, we affirm.