This Opinion is a
Precedent of the TTAB

Mailed: May 16, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re USA Warriors Ice Hockey Program, Inc.*

_____

Serial No. 86489116

_____

Andrew B. Katz of Belles Katz LLC,
    for USA Warriors Ice Hockey Program, Inc.

Alison Keeley, Trademark Examining Attorney, Law Office 113,
    Odette Bonnet, Managing Attorney.

_____

Before Quinn, Cataldo and Bergsman,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

USA Warriors Ice Hockey Program, Inc. ("Applicant") seeks registration on the Principal Register of the mark USA WARRIORS ICE HOCKEY NONE TOUGHER and design, shown below, for "arranging and conducting ice hockey programs for injured and disabled members and veterans," in Class 41.[1]

---

[1] Application Serial No. 86489116 was filed on December 23, 2014, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's allegation of a *bona fide* intention to use the mark in commerce.



Applicant disclaimed the exclusive right to use the terms "USA" and "Ice Hockey."

The application includes the following description of the mark:

> The mark consists of the wording "USA WARRIORS ICE HOCKEY NONE TOUGHER" and a design. The wording "USA WARRIORS ICE HOCKEY" appears inside the outline of a rectangle. The wording "USA" in a stylized font, with two stripes appearing below the "US", and a five-pointed star appearing inside the "A", creating the impression of a waving flag. Below the rectangle appears the design of a shield with a five-point star inside. ***Inside the star appears a sled hockey player, lying on a sled and holding a hockey stick in each hand.*** The hockey player is wearing a jersey with "USA" appearing in the same stylization as above. The wording "NONE TOUGHER" appears in the shield below the star. (Emphasis added).
>
> Color is not claimed as a feature of the mark.

Applicant also claimed ownership of Registration No. 4331507 for the mark USA

WARRIORS ICE HOCKEY NONE TOUGHER and design, shown below, for

"arranging and conducting ice hockey programs for injured and disabled members and veterans," in Class 41.[2]



The registration includes the following description of the mark:

> The mark consists of a white rectangle with a red border with the words "USA WARRIORS ICE HOCKEY" in blue above a blue shield with a red border. "USA" is in italics and the bottom part "S" in "USA" is made with two red stripes. A white star with a red border is inside the shield. ***A figure of an ice hockey player with a hockey stick in blue and a puck in red are inside the star.*** The words "NONE TOUGHER" appear in white below the star. (Emphasis added).

> The color(s) red, white, and blue is/are claimed as a feature of the mark.

Applicant's marks differ only in two ways: (1) the colors red, white, and blue are claimed as a feature of the registered mark; and (2) the mark in the pending

---

[2] Registered May 7, 2013.

application features the image of a sled hockey player in the center of the star instead of a standing hockey player.[3]

The Trademark Examining Attorney has refused registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark so resembles the mark USA HOCKEY and design, shown below,



in two registrations, owned by the same entity, for the services listed below:

> Entertainment in the nature of hockey games, exhibitions, competitions, and tournaments; providing on-line sports information in the field of hockey," in Class 41;[4] and

> Association services; namely, promoting and encouraging the sport of amateur ice hockey, including promulgating guidelines and rules for ice hockey competitions, sanctioning ice hockey associations, leagues, teams and players, and selecting hockey teams to represent the United States internationally, in Class 35.[5]

Registrant disclaimed the exclusive right to use the word "Hockey."

---

[3] Sled hockey is a variation of ice hockey that allows participants with a physical disability to compete. *See* USAHockey.com/sledhockey and Wikipedia.com attached to the October 22, 2015 Office Action. "Players sit in specially designed sleds that sit on top of two hockey skate blades. There are two sticks for each player instead of one and the sticks have metal pics on the butt end for players to propel themselves." USAHockey.com/sledhockey.

[4] Registration No. 2739877, registered July 22, 2003; renewed. In this registration, "USA" was registered under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).

[5] Registration No. 2833759, registered April 20, 2004; renewed.

When the refusal was made final, Applicant appealed and requested reconsideration. After the Trademark Examining Attorney denied the request for reconsideration, the appeal was resumed. We affirm the refusal to register.

Applicant argues that this case is analogous to *In re Strategic Partners, Inc.*, 102 USPQ2d 1397 (TTAB 2012), a case where we reversed a Section 2(d) refusal based in part upon our finding that the applicant owned a registration for a substantially similar mark that had co-existed with the cited registration for over five years. Applicant here argues:

> The evidence of record shows: (1) Applicant's existing registration for a nearly identical mark, USA WARRIORS ICE HOCKEY NONE TOUGHER & Design, Reg. No. 4331507, for identical services has long existed with the Cited Marks on both the register and in the marketplace; and (2) evidence that USA Hockey, Inc. [Registrant], which is the owner of the Cited Marks, displays Applicant's Mark on the USA Hockey's website and promotes Applicant's services, reflecting not only USA Hockey's knowledge of Applicant's Mark, but also USA Hockey's approval of that mark.[6]

As noted above, Applicant also argues that we should consider the fact that the owner of the cited registration is aware of Applicant and its mark because the owner of the cited registration discusses Applicant's services and displays Applicant's prior, slightly different registered mark on its website.[7]

---

[6] Applicant's Brief, pp. 1-2 (7 TTABVUE 2-3). Applicant does not address the similarity or dissimilarity of the marks but "does not dispute that the parties offer related services." Applicant's Brief, p. 3 n.1 (7 TTABVUE 4).

[7] Applicant's Brief, pp. 1-2 (7 TTABVUE 2-3); Applicant's Brief, pp. 5-6 (7 TTABVUE 6-7).

The Examining Attorney argues that neither of these facts highlighted by Applicant sufficiently overcome the weight of other relevant facts of record that indicate confusion is likely. In the Examining Attorney's view, *Strategic Partners* does not mandate reversal because, in this case, Applicant's prior registration and the cited registrations have not coexisted as long as the period of coexistence in *Strategic Partners*.[8] Further, the Examining Attorney found, and maintains here, that Applicant has failed to show that the Registrant has consented to Applicant's registration of the mark at issue here.[9]

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); *see also In re Majestic Distilling Co.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We have considered each *du Pont* factor that is relevant and for which there is evidence of record. *See M2 Software, Inc. v. M2 Commc'ns, Inc.,* 450 F.3d 1378, 78 USPQ2d 1944, 1947 (Fed. Cir. 2006); *ProMark Brands Inc. v. GFA Brands, Inc.,* 114 USPQ2d 1232, 1242 (TTAB 2015) ("While we have considered each factor for which we have evidence, we focus our analysis on those factors we find to be relevant.").

---

[8] Trademark Examining Attorney's Brief (9 TTABVUE 14-15).

[9] Trademark Examining Attorney's Brief (9 TTABVUE 15). Applicant neither argued nor presented evidence that Registrant has entered into a written or oral consent to the use or registration of Applicant's mark.

Notably, Applicant does not dispute that the evidence shows that the marks are similar, that the services are related in that they are of a type that consumers will perceive may well be offered by the same source, or that these facts support the Examining Attorney's refusal. We therefore turn first to the two specific arguments Applicant has advanced.

A. Coexistence of registrations; Consent to registration.

Applicant first argues that the facts in his appeal are analogous to the facts in *Strategic Partners* in which *du Pont*'s thirteenth factor (*i.e.,* any other established fact probative of the effect of use) played a prominent role. This *du Pont* factor "accommodates the need for flexibility in assessing each unique set of facts." *Strategic Partners,* 102 USPQ2d at 1399.

*Strategic Partners* involved co-existing registrations each more than five years old and immune to attack on likelihood of confusion grounds. *See* Section 14 of Trademark Act, 15 U.S.C. § 1064. Where, as in *Strategic Partners*, that is the case, that fact may well play an important, and perhaps pivotal, role in the likelihood of confusion analysis. *See Strategic Partners*, 102 USPQ2d at 1399.

In *Strategic Partners*, appellant owned a registered mark that had coexisted with the cited mark for over five years. Because appellant's prior registration was over five years old, it was not subject to attack by the owner of the cited registration based on a claim of likelihood of confusion. 102 USPQ2d at 1399. In finding no likelihood of confusion in *Strategic Partners*, the Board provided the following explanation:

> [T]he present case involves the unique situation presented
> by the coexistence of applicant's existing registration with

the cited registration for over five years, when applicant's applied-for mark is substantially similar to its existing registered mark, both for identical goods. When we consider these facts under the thirteenth *du Pont* factor, we find in this case that this factor outweighs the others and leads us to conclude that confusion is unlikely.

*Strategic Partners,* 102 USPQ2d at 1400.

In the case before us, Applicant's existing registration has coexisted with the cited registrations for less than five years. This is significant not only because it is less time, but because the five-year milestone carries added weight because of its legal significance under the Lanham Act: it means that Applicant's registration, issued May 7, 2013, is still subject to a cancellation action by Registrant based on likelihood of confusion. This represents a key factual distinction from *Strategic Partners. See* Section 14 of the Trademark Act, 15 U.S.C. § 1064. We therefore find that, while the 3½ year co-existence of Applicant's prior registration and the cited registration is a relevant consideration, it does not outweigh the other *du Pont* factors in this case.[10]

We now turn to Applicant's argument about the significance of Registrant's display, on its website, of Applicant's previously-registered, slightly different mark,

---

[10] We point out additionally that to hold otherwise would essentially give binding effect to the decision of a Trademark Examining Attorney in granting Applicant's prior registration. Neither the Board nor any Trademark Examining Attorney is bound by decisions of Examining Attorneys to register prior marks. To the contrary, "the [US]PTO must decide each application on its own merits, and decisions regarding other registrations do not bind either the [USPTO] or [the reviewing] court." *See In re Boulevard Entm't*, 334 F.3d 1336, 67 USPQ2d 1475, 1480 (Fed. Cir. 2003). The issuance of Applicant's first registration does not require the approval of a second registration if, on the facts of the case, it would be improper to do so under the governing legal standard. *See, e.g.*, *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) ("The PTO is required to examine all trademark applications for compliance with each and every eligibility requirement, including non-genericness, even if the PTO earlier mistakenly registered a similar or identical mark suffering the same defect.").

in connection with a short discussion of Applicant's organization. It is settled that where a registrant has entered into an agreement consenting to the registration of an applicant's mark, that fact may play a crucial role in the likelihood of confusion analysis.[11] But there is no written consent agreement of any type in the record here. We will not infer that the Registrant consents to registration of Applicant's mark based on Registrant's apparent knowledge of the existence and reproduction on its website of Applicant's previously-registered, slightly different mark.[12]

We find the circumstances here similar to those we faced in *In re Opus One Inc.,* 60 USPQ2d 1812 (TTAB 2001). As in *Opus One,* "there is no indication in the record that applicant ever sought to obtain a consent or agreement from registrant, nor is it apparent that registrant is even aware that applicant has applied to register the mark." *Id.* at 1821 n.13. Thus, as in *Opus One,* we decline to find that Registrant's failure to object to Applicant's previously registered mark is "necessarily attributable

---

[11] *See, e.g., In re Four Seasons Hotels Ltd.*, 987 F.2d 1565, 26 USPQ2d 1071, 1072 (Fed. Cir. 1993) (holding that the consent agreement carries great weight); *Bongrain Int'l v. Delice de France*, 811 F.2d 1479, 1 USPQ2d 1775, 1778 (Fed. Cir. 1987) ("We have often said in trademark cases involving agreements reflecting parties' views on the likelihood of confusion in the marketplace, that they are in a much better position to know the real life situation than bureaucrats or judges and therefore such agreements may, depending on the circumstances, carry great weight."); *In re N.A.D. Inc.*, 754 F.2d 996, 224 USPQ 969, 970 (Fed. Cir. 1985) ("While we are uninformed as to all the details of the disputes and negotiations, these competitors clearly thought out their commercial interests with care. We think it highly unlikely that they would have deliberately created a situation in which the sources of their respective products would be confused by their customers."); *du Pont*, 177 USPQ at 568 ("when those most familiar with use in the marketplace and most interested in precluding confusion enter agreements designed to avoid it, the scales of evidence are clearly tilted.").

[12] As discussed below, Registrant has posted a webpage featuring Applicant's services and mark on Registrant's website (USAHockey.com). *See* Applicant's September 29, 2015 Response to Office Action.

to, and necessarily evidence of a business-driven belief on the part of registrant that there is no likelihood of confusion." *Id.* at 1821. Just as in that case, we think here that:

> registrant's conduct, particularly the fact that registrant has not objected to applicant's use of the mark, reasonably might also be attributable to a belief on registrant's part that applicant is using the mark pursuant to registrant's approval and permission, and that registrant has the right to require applicant to cease using the mark in the event that the quality, nature or extent of applicant's restaurant services were to change in a way detrimental to registrant's interests.

*Id.; see also In re Ass'n of the U.S. Army,* 85 USPQ2d 1264, 1274 (TTAB 2007) (even if the U.S. Army consents to applicant's use of its mark, "there is nothing in the record from which we might infer that the U.S. Army also consents to applicant's *registration* of the mark").[13]

We further note that, when it is within a party's power to produce a certain kind of persuasive testimony or documentary evidence on an urged factual finding, and it

---

[13] We feel it important to note that, although we have considered such arguments here, it is generally inappropriate for an applicant to litigate a third-party registrant's actions and motives—in possible derogation of the statutory presumptions afforded a registrant under Section 7(b), 15 U.S.C. § 1057—in an *ex parte* proceeding. Such facts are appropriate for *inter partes* disputes that are statutorily-authorized to be instituted by such third-parties against the registrant. But before then, the owner of the cited registration is entitled to rely, in the first instance, upon the PTO's fulfillment of its statutory duty to refuse registration to marks confusingly similar to a prior registrant's mark. *See In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1408, 41 USPQ2d 1531, 1535 (Fed. Cir. 1997) ("Dixie argues alternatively that the PTO should pass the mark to publication and allow the registrant to oppose the applicant's mark, if it chooses. But it is the duty of the PTO and this court to determine whether there is a likelihood of confusion between two marks. It is also our duty to afford rights to registrants without constantly subjecting them to the financial and other burdens of opposition proceedings. Otherwise protecting their rights under the Lanham Act would be an onerous burden for registrants.") (citations and internal quotation marks omitted).

fails to do so, a tribunal is at least permitted—perhaps even compelled—to draw the inference that that fact is unsupported and/or untrue. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 225-26 (1939); *McMahon & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632-33 (6th Cir. 2000); *Adams v. Dep't of Transp.*, 735 F.2d 488, 492 (Fed. Cir. 1984); *Learned v. Thompson*, 191 F.2d 409, 91 USPQ 57, 60-61 (CCPA 1951). Here, we find that Applicant's evidence lacks the weight Applicant attributes to it without an actual written consent to registration.

We find that Applicant has failed to demonstrate Registrant's consent to the registration of Applicant's mark.

B. The similarity or dissimilarity of the marks.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See du Pont,* 177 USPQ at 567. As noted, Applicant does not dispute the Examining Attorney's finding that the marks are similar. On this record, we agree. In comparing the marks, we are mindful that "[t]he proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012); *see also San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Rests. Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd mem.,* 972 F.2d 1353 (Fed. Cir. 1992).

The marks are similar insofar as they share the term "USA" in an *identically* stylized format: the letters USA are incorporated into and transformed into a representation of the flag of the United States. In addition, in each mark there is a star incorporated into the letter "A." Also both marks include the word "Hockey" identifying the sport at issue. In neither mark is any other word so highly-stylized or in a larger typeface. And while Applicant's multi-component mark contains additional words and graphics, we find that, due to the identically-stylized USA shared by the marks, participants, fans, and other relevant consumers are likely to mistakenly believe that Applicant is associated with Registrant.

The Examining Attorney submitted evidence showing that teams playing in a particular league commonly wear the logo of the league. *See* the excerpts from the MLSsoccer.com, DCUnited.com, Seahawks.com, NFL.com, NHL.com, websites attached to the April 3, 2005 Office Action and the Binghamtonsenators.com and Thesphl.com websites attached to the October 22, 2015 Office Action. Thus, USA WARRIORS ICE HOCKEY is likely to be perceived as a team for disabled or injured veterans that is related to or under the larger umbrella of the USA HOCKEY team, or as the WARRIORS team of a USA Hockey league, or as a constituent league within a larger organization.

We find as a result that the marks are similar in terms of appearance, sound, connotation, and commercial impression.

C. The similarity or dissimilarity and nature of the services.

As noted, Applicant does not dispute that the services are related. We find that they are. In determining whether the services are related, it is not necessary that the Applicant's services and Registrant's services be similar or competitive in character to support a holding of likelihood of confusion; it is sufficient for such purposes if the services are related in some manner or if the circumstances surrounding marketing of these services are such that they could give rise to the mistaken belief that they originate from or are in some way associated with the same source. *Coach Servs.,* 101 USPQ2d at 1722; *Edwards Lifesciences Corp. v. VigiLanz Corp.,* 94 USPQ2d 1399, 1410 (TTAB 2010); *Schering Corp. v. Alza Corp.,* 207 USPQ 504, 507 (TTAB 1980).

The Trademark Examining Attorney has submitted excerpts from websites demonstrating that traditional hockey leagues offer hockey programs for physically disabled participants. *See* the excerpts from the CSHA.com, SAHAOnline.org, Leagueathletics.com and Snokinghockey.com websites attached to the October 22, 2015 Office Action; *see also* the excerpts from the websites of professional hockey teams sponsoring sled hockey teams at Buffalosaberssledhockey.org, Sabres.NHL.com, MNSledhockey.org, Wild.NHL.com, Sarampage.com, Ric.org, Kings.NHL.com, and Rangers.com attached to the October 22, 2015 Office Action.

The Trademark Examining Attorney has also submitted excerpts from (1) the United States Tennis Association (usta.com) advertising its mission "to promote and develop the growth of tennis," including professional tennis, community tennis, and wheelchair tennis, (2) Registrant's website (usahockey.com) promoting the support

and development of grassroots hockey programs, including youth, junior and adult hockey, as well as hockey programs for disabled competitors, and (3) the United States Olympic Committee (teamusa.org) promoting support for the U.S. Olympic and Paralympic athletes.[14] These websites demonstrate that prominent sports organizations indeed offer programs for physically disabled athletes.

Our reading of the Registrant's and Applicant's identification of the services indicates that Applicant's limited services are subsumed within Registrant's broader services. Specifically, Registrant's identification includes presenting hockey games, without any limitations as to the physical capabilities of the participants. Applicant's identification states that it "arrang[es] and conduct[s] ice hockey programs for injured and disabled members and veterans." That is within the scope of Registrant's mark. Registrant's webpage in the record corroborates this fact: as pointed out by Applicant, Registrant has posted a webpage featuring Applicant's services and mark on Registrant's website (USAHockey.com).[15] An excerpt from the posting is displayed below.

---

[14] April 3, 2015 Office Action.

[15] Applicant's September 29, 2015 Response to Office Action. As discussed above, we do not infer from this document alone that Registrant consented to Applicant's registration of the mark.

**USA Hockey National**



**USA Warriors**



The USA Warriors Ice Hockey Program was founded in 2008 in conjunction with the USA Disabled Hockey Program to give military members and veterans who have been injured or disabled in the course of their service the chance to play hockey in an environment suited to their needs. The program supplies participants with hockey equipment and trains them in the skills needed to use hockey as a rehabilitation tool to overcome physical and mental disabilities sustained in their service to the nation.

**Interested in playing?** Interested players or sponsors should contact a program representative by email: info@usawarriorshockey.org

We find that the services are related.

D. Balancing the factors.

Because the marks are similar and the services are related, we find that Applicant's mark USA WARRIORS ICE HOCKEY NONE TOUGHER and design for "arranging and conducting ice hockey programs for injured and disabled members and veterans" is likely to cause confusion with the registered mark USA HOCKEY and design for "entertainment in the nature of hockey games, exhibitions, competitions, and tournaments; providing on-line sports information in the field of hockey" and "association services; namely, promoting and encouraging the sport of amateur ice hockey, including promulgating guidelines and rules for ice hockey competitions, sanctioning ice hockey associations, leagues, teams and players, and selecting hockey teams to represent the United States internationally."

- 16 -

**Decision**: The refusal to register Applicant's mark USA WARRIORS ICE HOCKEY NONE TOUGHER and design is affirmed.