**In re the VISICON SHAREHOLDERS TRUST, an Ohio Trust u/a/d November 11, 2002 dba The Hope Hotel and Conference Center, Debtor in Possession.**

No. 10–33736.

United States Bankruptcy Court,
S.D. Ohio,
Western Division,
at Dayton.

Aug. 29, 2012.

benefits of a Chapter 11 bankruptcy, but being unwilling or unable to comply with its burdens.

## I. Procedural Background

The debtor, the Visicon Shareholders Trust, An Ohio Trust U/A/D November 11, 2002 dba The Hope Hotel and Conference Center (the "Debtor," "Debtor–in–Possession" or the "Trust") filed a voluntary bankruptcy petition under Chapter 11 of Title 11 of the United States Code on June 8, 2010. The petition was filed with the box for the "Type of Debtor" being marked as "Corporation"[1] and the "Nature of Business" section reflecting it as a single asset real estate case. The Debtor's secured lender, GCCFC 2002–C1 Dayton H0tel and Conference Center, LLC ("GCCFC"), moved to dismiss the bankruptcy case on November 10, 2011. On May 21, 2012 GCCFC moved to prohibit the use of its cash collateral, with the Debtor opposing that motion and requesting the use of cash collateral. The dismissal and cash collateral motions were litigated during a hearing which commenced on June 28, 2012 and concluded on July 3, 2012 (the "Hearing"),[2] after which GCCFC, the Debtor, and the United States Trustee (the "UST") filed post-hearing memoranda.[3]

## II. Findings of Fact

The Debtor is a Trust created on November 11, 2002 (GCCFC Exhibit 7) and owns the Hope Hotel and Richard C. Hol-

Walter Reynolds, Tami Hart Kirby, Dayton, OH, for Creditor.

Bill C. Wells, Division Chief, Wright–Patterson Air Force Base, AFMCLO/JAK, Wright–Patterson AFB, OH, for the United States Air Force.

MaryAnne Wilsbacher, Office of the United States Trustee, Columbus, OH, Assistant United States Trustee.

Jeremy Shane Flannery, Office of the United States Trustee, Columbus, OH, for the United States Trustee.

**Decision Dismissing Chapter 11 Case; Granting Secured Creditor's Motion to Prohibit Use of Cash Collateral; Denying Debtor In Possession's Motion to Use Cash Collateral; and Denying Debtor In Possession's Motion for the Retroactive Retention of an Accounting Firm**

GUY R. HUMPHREY, Bankruptcy Judge.

This decision concerns the consequences of a debtor-in-possession embracing the

---

1. This designation, although not intuitive, was correct because the Bankruptcy Code defines a corporation to include a business trust. 11 U.S.C. § 101(9)(A)(iv).

2. The delays in commencing the hearing were consented to by GCCFC.

3. This decision also rules upon an amended application seeking approval of the retention of an accounting firm for the Debtor on a retroactive basis. The employment of a forensic accountant who testified at the Hearing is addressed by a separate order.

brooke Conference Center (the "Hotel").[4] The grantors were David A. Meyers ("Meyers") and Visicon, Inc., an Ohio subchapter S corporation. The Trust originally had three beneficiaries, but Meyers has been the sole beneficiary since 2004.[5] On November 25, 2002, Meyers and Amanda Meyers, as co-trustees of the Trust, refinanced its collateralized obligation by executing a promissory note for the benefit of Greenwich Capital Financial Products, Inc. in the amount of $9,000,000, secured by a Security Interest, OpenEnd Leasehold Mortgage, Assignment and an Assignment of Rents. This secured note was assigned to GCCFC in 2010 (Debtor Exhibit 42— allonge dated February 17, 2010).[6]

The obligation under the promissory note was guaranteed by Meyers (Debtor Exhibit 18), who subsequently became the sole trustee of the Trust. In its filed proof of claim (4–1), GCCFC asserts it is owed $8,251,952 as of the petition date, plus a per diem interest rate and additional fees and expenses under the promissory note and related loan documents. The promissory note is serviced by LNR Partners, Inc. ("LNR"). Pursuant to an oral agreement, the Hotel initially paid $210,000 on the promissory note post-petition and subsequently paid $50,000 each month to GCCFC.

The Hotel is located on real estate owned by the United States as part of Wright–Patterson Air Force Base. The land is leased from the United States under a lease which expires in 2028, with the consideration being $1 for the entire term of the lease. The Hotel is unique in that it was constructed under the auspices and for the benefit of the United States Air Force.[7] The lease was assigned to the Trust in December 2002 at about the same time as the refinancing.

The Hotel began operations in 1990 and continues to serve primarily as a means of providing temporary lodging for civilian and military personnel conducting business at the Wright–Patterson Air Force Base, although anyone may stay there.[8] It has a restaurant and bar, a catering service, and a conference center. The Hotel was designed to the specific requirements of the Air Force. Most of the business is generated by individuals conducting business at the Wright–Patterson Air Force Base although various groups hold functions there. An Operating Agreement for the Hotel was entered into with the Air Force on January 11, 1989[9] and memorialized many details of the Hotel's operations, including fixing room rates for military personnel, which are adjusted for inflation as measured by the consumer price index.

4. In 2010, the conference center was renamed after Richard C. Holbrooke because it was there that Mr. Holbrooke negotiated the Bosnian Peace Accords.

5. Vivian Barlow and Vernon Barlow were the other beneficiaries.

6. The evidence was the only member of GCCFC is a securitization trust governed by a pooling agreement in which Bank of America, N.A. is the Trustee (See GCCFC 43–4 & 43–5).

7. The value of the Hotel is reduced because the lease expires in less than 30 years according to the testimony of Christopher Brown of

LNR Partners, Inc. Meyers agreed that the 2028 expiration date for the lease was a serious concern and has attempted, but as of yet failed to obtain a lease extension from the Air Force.

8. 75 rooms are set aside primarily for group events and the other rooms are not available for the general public except for late bookings, with the intention that those rooms be available to military personnel coming to the base if there is not otherwise living space available on the base for them.

9. The original lessee was the Vantage Group, Inc.

Meyers visits the Hotel 3 to 4 times each year, although his visits became more frequent in recent months. He has ultimate responsibility for most of the Hotel's financial issues. The general manager who runs the Hotel's daily operations is Doyene "Micki" Witter, who is Meyers' mother-in-law. Witter has many years of experience in the hospitality business, including the hotel industry, but never ran a hotel as a general manager before being employed by the Hotel 13 years ago. Angela Turner is the bookkeeper and writes almost all the checks to pay the Hotel's accounts payable. Witter has little involvement in the Hotel's finances; although she did peruse profit and loss statements and review certain checks and remittances as Turner's direct supervisor.

The Hotel's occupancy rate began to decline in 2005, largely because military personnel were staying at hotels off the base in the surrounding area.[10] Faced with a foreclosure proceeding pursued by GCCFC, the Debtor filed a Chapter 11 bankruptcy petition.

GCCFC and the Debtor never entered into a formal cash collateral agreement, but instead agreed that cash collateral would only be used to pay for the reasonable and necessary expenses of the Hotel. The Debtor filed a motion to use cash collateral on an interim and final basis on September 27, 2010 (doc. 49), which included a consolidated budget for the period of October 2010 through March 2011. No objections were filed, but the Debtor never presented an order to the court. The parties instead operated under an informal agreement throughout the case. On May 10, 2012, the court issued an order (doc. 151) providing all parties in interest an opportunity to explain why the motion to use cash collateral was not moot. No responses were filed, and the court denied the motion as moot (doc. 160).

As the evidence at the Hearing ultimately demonstrated, the Debtor violated fundamental precepts of Chapter 11 bankruptcy repeatedly and sometimes without any explanation. At times, the evidence revealed a disturbing picture of the Debtor-in-Possession continuing to manage its finances post-petition as if nothing had changed. The reasons for this apparently cavalier approach never were completely clear, but what was exhibited was quite clearly a pattern of behavior and not discrete instances of a failure to comply. These violations include (1) paying all undisputed non-priority unsecured creditors without authorization of the bankruptcy court; (2) retaining and compensating legal and accounting professionals without authorization of the bankruptcy court; (3) the failure to file any monthly operating reports that were complete and accurate, and which did not include misleading, missing and inaccurate information concerning the debtor's finances and payments to insiders and (4) the failure to file post-petition tax returns in a timely and accurate manner, as well as other significant accounting irregularities which colored all the financial information provided

---

**10.** The reasons given for this decline in occupancy were a lack of regular meetings with the Management Review Committee, a committee composed of Hotel management and individuals from the Air Force, a lack of regular contact with a specific liaison from the Air Force, problems implementing a web-based reservation system, and military housing reservations not being specifically made for Wright–Patterson Air Force Base but instead Dayton, Ohio. The evidence showed many of these issues were resolved and, in the instance of the web-based reservation issue, would likely be resolved within six months. The actual profit or loss of the Hotel month-to-month is unclear because the information filed with the court in the monthly operating statements was shown at the hearing to be unreliable.

to the court, the creditors and the UST. Based on the testimony of the key actors working at the Hotel, the Debtor's forensic accountant and other undisputed evidence which will be detailed, little changed in the Debtor's approach from the filing date to the Hearing over two years later.

### A. Payment of Pre–Petition Debt without Court Authorization and the Post–Petition Use of a Prepetition Bank Account

The evidence was undisputed that, without court approval, trade vendors with pre-petition debts were paid in the ordinary course of business with post-petition revenue of the Hotel. Turner candidly testified that no one ever told her to do anything differently in regard to the payments of pre-petition invoices.

Specifically, the expert forensic accountant retained by GCCFC, Warren M. Schneider ("Schneider"), testified concerning his expert report that "at least $17,157.11 of pre-petition payables were subsequently paid by the Debtor in Possession...." The report includes a table showing 15 vendors paid with checks from June 9, 2010 (the day after the petition was filed) through October 5, 2010. This issue was not addressed in the report of the Debtor's accounting expert, Alan C. Duvall ("Duvall"), nor was it addressed by any of the lay witnesses. The Debtor's Schedule F, which is the official bankrupt-cy form to list all unsecured non-priority creditors, lists only one debt, Bertchlynn Properties, LLC, which is a disputed debt of $36,218. Schedule F was never amended.

In addition, without designating the account as a debtor-in-possession bank account, the Debtor conducted significant transactions from a prepetition bank account from June 9, 2010 through October 5, 2010 before closing the account.[11]

### B. Retention and Payment of Professionals without Court Authorization

The Debtor retained and compensated numerous professionals without court authorization or, in certain instances, may have paid professionals holding unsecured debt with post-petition funds. In some instances, the court has no information as to why payments were made, when the work was done, or even if the payments related to work for the bankruptcy estate.

The law firm of Keating Muething and Klekamp was paid post-petition by check on three occasions with insufficient explanation.[12] The accounting firm of Birnbrey, Minsk, Minsk & Perling LLC ("Birnbrey") was also paid by check—the earliest dated July 13, 2010 and the latest dated June 7, 2011. However, the first application to retain Birnbrey was not filed until May 25, 2012 and sought retro-

---

11. See Debtor Exhibit 2 [GCCFC 0587].

12. A check dated $2,720 was paid to the order of Keating Muething and Klekamp on August 19, 2010 and negotiated. Another check dated September 28, 2010 for $3,910 was also negotiated. The final negotiated check was for $595 and dated October 20, 2010. The General Ledger shows these bills were added postpetition, but no information was provided as to when the services were rendered or to what benefit these services were to the bankruptcy estate (GCCFC Exhib-it 2 [GCCFC 0597] ). In addition, the Debtor never attempted to explain or argue whether this professional was covered by § 327(a), § 327(e) or somehow exempt from these statutory requirements, despite having previewed Schneider's report in advance of the Hearing. The only testimony from the Debtor on this subject was Meyers' testimony that showed Keating did general corporate work for the Trust and was paid "automatically." Turner did not know who this professional was or if any documentation existed.

active retention from the petition date—an approximate 2 year period. By agreement of the parties, that motion was denied without prejudice.[13] A check dated June 10, 2010—two days after the petition was filed—was paid to the order of Flagel, Huber, Flagel & Co. ("Flagel") in the amount of $7,950, presumably for a pre-petition invoice. Later, Turner was told not to pay Flagel any additional sums. The reason was not due to a concern about complying with bankruptcy law, but instead, as discussed elsewhere, to Meyers' disagreement with Flagel's interpretation that Witter owed a significant account receivable to the Hotel. Thomas J. Intilli Co., L.P.A. was paid $652 through a check dated August 16, 2011. Meyers did not recall if this payment was for personal legal services or for services provided to the Hotel. The firm Holmes Kurnik, P.A. was paid $1,500 by check dated May 25, 2011. Turner did not know who this firm was despite the fact that she signed this check as well as all the others referenced. Although Lawrence Henke, who is a lawyer, was paid $588, charged to Meyers' credit card on March 22, 2011, Meyers had no recollection of the charge.[14] On

January 31, 2011 $1,500 was charged to Meyers' credit card to pay John D. Smith Co. LPA. The legal services were for attendance of counsel at Turner's deposition. Meyers indicated he intended to reimburse the Hotel for this cost, but has never done so.[15] Finally, Robert Lachey acted as counsel for the Trust, including participating in a Management Review Committee meeting with the Air Force on March 29, 2011. It was never established whether he was compensated from post-petition cash generated by the Hotel.

## C. Failure to File Complete and Accurate Monthly Operating Reports

The Debtor is required by the UST to file monthly operating reports as part of its reporting requirements.[16] Throughout the entire pendency of this case, the Debtor included the following statement in every monthly report: "Balance Sheets are under review by the CPA and will be supplemented at a later date." The Debtor never provided any reasonable explanation for the failure to include balance sheets for two years and Turner testified that the Hotel does not retain a CPA.[17]

13. The amended application is denied in a separate section of this decision and through a separate order and requires all estate funds paid to Birnbrey post-petition be disgorged to GCCFC.

14. The evidence also established that the bills for all of the credit card discussed in this decision, including Meyers' credit card, were paid from Hotel revenues and that the Hotel has not been reimbursed for any charge appearing on those statements, even if such charge was for a principal's sole benefit.

15. Meyers indicated the balance on the credit card was to have been kept over $1,500 to reflect this charge, although the statement for the period ending March 11, 2012 reflects that the credit card had a lower balance. This self-characterized loan to Meyers had not been repaid as of the Hearing.

16. As noted in the opening paragraph of the Chapter 11 Operating Requirements and Reporting Requirements, the United States Trustee is required to supervise the administration of Chapter 11 cases. 28 U.S.C. § 586(a)(3). See GCCFC Exhibit 44 (Office of the United States Trustee; Chapter 11 Operating Instructions and Reporting Requirements).

17. Meyers had some limited contact with Birnbrey, Minsk, Minsk & Perling LLC about this issue during the bankruptcy, but nothing was done to rectify the balance sheet problem. The evidence did not show the balance sheets ever were under review in any meaningful way. Therefore, Turner's testimony that the Hotel did not have a CPA appeared essentially correct and consistent not only with the lack of balance sheets in the Debtor's monthly operating reports, but also with the lack of any post-petition tax returns filed for the

Further, the expert testimony of Schneider was persuasive that the profit and loss statements included within the operating reports likely are inaccurate because incorrect information from the Quick Books [18] balance sheet was transferred directly to each profit and loss statement.

The monthly operating reports repeatedly failed to list payments to insiders on Schedule 6 of the monthly operating reports. Mortgage payments and association fees for a condominium in Florida owed by Witter and used by Meyers and Witter and car lease payments for Meyers, Angela Meyers and Witter were never disclosed in any of the monthly operating reports. The monthly operating reports were also inaccurate as to the payment of professionals without court authorization. Meyers, as Trustee of the Trust, signed these reports under penalty of perjury.

Although Meyers testified he reviewed the monthly operating reports, a cursory review of the financial disclosures would have identified obvious inaccuracies. Even obvious mistakes were left unaddressed, repeated monthly and never rectified.

### D. Post–Petition Payment of Personal Expenses of Insiders with Hotel Revenue

The Hotel maintains credit card accounts with Chase that were paid by Turner. Meyers, Angela Meyers and Witter each had a separate account number.[19] GCCFC introduced evidence establishing that there were numerous charges made on these accounts to pay the personal expenses of these three insiders.

Although she never had a role with the Hotel and was simply a beneficiary of the Trust, Amanda Meyers, Meyers' wife and Witter's daughter, charged $56,358 to one of the Chase cards from May 12, 2010 through March 11, 2012 which has never been reimbursed. In at least one instance Amanda Myers was also sent a check.[20] In addition, both Meyers and Witter [21] spent significant sums on personal expenses that were never reimbursed.[22]

Trust or Visicon, Inc. The only credible evidence as to the failure to complete the balance sheets was that Meyers disagreed with the accountants' characterization of funds advanced for his benefit to purchase his former wife's interest in the Trust as a shareholder receivable.

**18.** Quick Books is an accounting software used by the Hotel and most of the data was entered by Turner.

**19.** *See* GCCFC Exhibits 25–41 for the credit card statements.

**20.** A check dated October 4, 2010 for $2,400 was paid to the order of Amanda Meyers (GCCFC Exhibit 17). The check was endorsed to Witter. Turner had no explanation for this check and never dealt directly with Amanda Meyers.

**21.** Meyers testified that he was unaware Witter, his mother-in-law, was an insider. *But cf.* 11 U.S.C. §§ 101(31)(B)(iv) (defining an insider as a relative of the person in control of a debtor corporation).

**22.** Some examples of personal expenses include tuition to Florida Gulf Coast University; retailers such as Nordstrom, Marshalls, the Gap, Target, J Crew and Dillards; personal flights for Witter and Meyers; jewelry, spas, beauty products, various restaurants and the Naples, Florida zoo. With very few exceptions, the charges on the Witter card and the Meyers card were all clearly personal and the court makes an adverse inference against the Debtor that all the charges were personal. Even if that were not the case, for certain charges such as QVC, a toy store, a jewelry store and a pet store, Witter gave explanations that were doubtful at best. Moreover, Witter testified she did not even review the Chase credit card statement for errors before it was paid. Meyers' testimony was credible that $1,484 was charged to the "Diamond District" in Florida for a gift for his wife that was never reimbursed and that he "forgot all about it."

Specifically, the statements introduced at the Hearing show that Meyers charged over $7,000 and Witter charged over $25,000 post-petition on the Chase cards.

Turner, whose testimony the court found quite credible, was never told not to pay these expenses, nor did she have invoices documenting that these expenses were related to the Hotel's operations. Personal expenses were categorized with other legitimate business expenses in the Quick Books accounting software. The court finds the decision to pay personal expenses from the Hotel's revenues was not a matter of sloppy accounting, but a deliberate decision by Meyers.

Turner also paid Meyers' American Express card.[23] Turner testified she paid it without reviewing the statement because Meyers told her to do so. Other credit cards were also paid with little explanation. Regarding the First National Bank of Omaha credit card, Meyers testified at his deposition on May 3, 2012 that he did not know the source of that card and would investigate. The checks paid to the order of First National Bank Omaha totaled $28,296.[24] However, at the time of the hearing two months later, he still had not investigated the issue and had nothing to add. Turner testified that she knew this was Meyers' credit card but knew nothing else about this account. Two checks were written to Fifth Third Bank post-petition, apparently related to another credit card account. Meyers believed that the Fifth Third Bank card was no longer active; however, nobody, including Turner, could testify why Fifth Third Bank was paid on this account. In addition, on September 23, 2010 Turner issued a post-petition check in the amount of $120 to Discover, but she testified that she knew nothing about the Discover card. Meyers testified that he had a Discover card "quite a while ago," but did not recall if he retained it post-petition.

The entry of data into the Quick Books accounting software used by the Hotel was consistent with a standard operating procedure of paying personal expenses for Meyers, Amanda Meyers and Witter. Turner would classify payments to the Chase Card by category. For example, if the Hotel paid for a personal flight for Meyers, it would be classified as "travel." None of the items on these statements paid was considered an account receivable owed by Meyers, Amanda Meyers, or Witter. Witter never reviewed her Chase statement and in at least one instance stated she accidentally paid for a personal expense with the Chase card. Meyers testified similarly. For the American Express card, Turner classified it according to Meyers' instructions. The evidence showed that the Hotel paid at least $120,000 in personal expenses for use of these credit cards alone, with no corresponding benefit.

However, the inappropriate use of the Hotel's revenues was not limited to the credit card charges paid by the Hotel. As noted, the Hotel paid for mortgage payments and association fees for a condominium in Florida that was owned by Witter. While there was some testimony presented on behalf of the Debtor that these payments were part of Witter's employment package, like the payments on the automobiles, there was no written employment agreement providing for such compensation. In addition, Witter's W–2 statements never reflected these payments. Not until 2011, after the issue had been raised by GCCFC, did Visicon, Inc. issue a 1099 to

---

23. GCCFC Exhibit 25.

24. All figures in this decision were taken from the admitted exhibits and rounded to the nearest dollar.

Witter for the payments made relating to the condominium. The court finds that these payments represented another example of the payment of personal expenses of insiders with no benefit to the Hotel.

The automobile lease payments for Meyers, Witter and for Amanda Meyers are not reasonable or necessary business expenses. The Debtor could not point to any employment agreement which required the payment of these expenses and, aside from commuting to work, which is not a necessary and reasonable business expense, the leased automobiles were not used by the Hotel. The car payments instead were another example of Meyers', Amanda Meyers' and Witter's use of the Hotel as a personal piggy bank.

### E. Use of Hotel Revenues for Improvements and Renovations

Besides the personal expenses of the insiders paid with Hotel revenues, the Debtor also spent significant funds on improvements and renovations to the Hotel. The problem with these expenditures was that none of them were approved by GCCFC or the court and many of these expenditures extended considerably beyond necessary maintenance of the Hotel. For example, the Debtor spent at least $632,732 in renovations in 2010 and $111,844 in 2011, including the purchase of new flat screen televisions and micro refrigerators.[25] Turner also testified that a majority of the invoices for recent renovations have been "misplaced."

The Debtor's explanation for many of these expenditures was that the Air Force, through its Lodging Chief, Colonel Kerri Kilgore, required such improvements as a condition for extending the lease.[26] The court has two concerns with this explanation. First, the Debtor did not provide sufficient evidence that, post-bankruptcy, the Air Force considered the need for these repairs to be imminent. Further, according to the Debtor, the Air Force did not even intend to renegotiate the lease until after a plan of reorganization was confirmed. Second, these expenditures should have been submitted to GCCFC for approval because of its interest in the Debtor's cash collateral. These expenditures were not normal and reasonable operating expenses. In the event that GCCFC did not agree to the expenditure of such funds and the Debtor believed that it had an obligation to make those improvements, repairs or renovations under its agreements with the Air Force, the matter could have been submitted to the court for a determination of whether such expenses were reasonable or necessary uses of cash collateral. Instead, the Debtor, consistent with its pattern, exercised self-help and continued to conduct business at the Hotel as if the bankruptcy and the cash collateral limitations were of no import.

### F. Lack of Disclosure and Transparency Concerning the Meyers and Witter Receivables

The Florida condominium provided no benefit to the Hotel. Instead, payments for the condominium should have been listed on the Debtor's schedules, like the multitude of unreimbursed personal expenses, as an account receivable of the Hotel owed by Witter. The Debtor also never filed the Quick Books balance sheet with its monthly operating reports, which would have listed this account receivable in the amount of $235,397 nor was it ever sched-

---

**25.** *See* Debtor Exhibit 5. The first two pages of Debtor Exhibit 5 were not admitted into evidence.

**26.** *See* Debtor Exhibit 21, meeting notes from a Management Review Committee meeting in April 2007.

uled as personal property of the Debtor. As referenced earlier, only after the issue was raised by GCCFC, the Hotel belatedly issued a 1099 to Witter by treating such payments as income. The weight of the evidence is the payments for the condominium were an unreimbursed personal expense of Witter with no benefit to the Hotel and, therefore, represent a legitimate account receivable of the Hotel.

The Debtor also failed to list on Schedule B a large receivable owed to the Trust by Meyers. Upon the refinancing of his collateralized obligation to Greenwich Capital, the evidence showed, according to the Quick Books balance sheet, that he owed $583,274 as of June 8, 2010 as a "Stockholder Receivable." This loan, originally in the amount of $475,000, was used to purchase Myers' former wife's interest in the Trust in connection with his divorce. Meyers asserted a lower figure of $108,000 was appropriate.[27] Even assuming Meyers was correct, he had no answer for the proven failure to disclose a significant asset.

Both of these accounts receivable constituted significant estate assets and should have been disclosed on the Debtor's schedules. The errors in the bankruptcy schedules were never corrected by amendment during the entire pendency of this Chapter 11 case.

G. *Failure to Maintain Accurate Books and Records and the Creation of Summary Accounts*

Under any view of the evidence, despite being in bankruptcy for two years, the Debtor failed to produce books and records that could be relied upon to provide useful and meaningful information to GCCFC, the UST or the court. This state of affairs may have, at least in part, resulted from the Debtor's failure to retain, or fully engage an accounting firm. Retention of an accounting firm to guide the Debtor through the Chapter 11 was fully within the control of the Debtor, but it was not until two years into the case that the Debtor sought the court's approval for the retention of an accountant.

The Debtor maintained its financial information through Turner's entry of data into Quick Books software. The Quick Books software would have been an acceptable method for tracking the Debtor's daily financial picture; however, the evidence established that these records were unreliable. The Debtor used information from the Quick Books software to prepare the monthly operating reports and classified accounts both receivable and payable through this system. Duvall testified that the Quick Books could not be relied upon by anyone. The Quick Books' obvious problems have never been meaningfully addressed.[28]

For example, all of the Debtor's representatives testified that the figures for the "account receivable tub" on the Debtor's books and records were inaccurate and could not be relied upon. The account receivable tub is used to accumulate charges for hotel guests while they are

---

**27.** Meyers tried to explain that his figure was based on his calculation of the division of assets during the divorce, but it was unclear why this division would affect his obligation to repay the loan as an account receivable of the Hotel.

**28.** The court's findings are not critical of Turner. Turner appeared to be a diligent, capable, and hard-working employee. The problems with the Debtor's financial information was not an issue as to Turner's entry of the data, but rather are attributable to management decisions (or the lack thereof) and the failure to engage appropriate professionals to assist in the proper reconciliation and presentation of the Debtor's financial information.

staying at the Hotel, but once paid those charges are to be removed from the account. Schneider testified that the figure in the account receivable tub should be approximately $30,000 at any given time for the size of the Hotel, depending upon the room rates and occupancy. However, the Quick Books showed the account receivable tub was $225,397 on the petition date and $424,280 on May 12, 2011. Schneider testified this figure was "terribly wrong" on the petition date and only got worse from that point forward. Turner testified she had been "looking into it" over the last six months and it was not corrected earlier because the Hotel did not have a CPA and "we didn't want to touch anything."

Schneider had two concerns regarding the account receivable tub. First, this figure could flow directly into the profit and loss statement of the Hotel without a balance sheet reconciliation, which should never be done. Second, Schneider testified this figure could provide a place upon the balance sheet to divert funds.

Pursuant to discovery, the Debtor provided a paper copy of its General Ledger for several years to GCCFC. However, on June 15, 2011, at about the time the General Ledger was provided to GCCFC, Meyers wrote a letter stating "To Whom It May Concern: The General Ledgers for 2009 and 2011 being provided to you are not the final versions and certain entries may be subject to further adjustment and/or reclassification."[29] However, GCCFC never received a final General Ledger for 2009 or 2011, despite the fact that the letter was written approximately a year before the Hearing.

When Schneider requested the Debtor's books and records for analysis purposes,

the Quick Books data was provided to Denise Duplinski of the Birnbrey accounting firm. Notwithstanding Turner's concern with not altering the Debtor's books and records, the evidence established that Duplinski deleted certain individual account entries for 2009 and replaced these individual account entries with summaries. Thus, details for those accounts were deleted prior to being provided to Schneider. Schneider referred to this conduct as the "purging" of the records. Following the Hearing on GCCFC's motion to dismiss, Duplinski described this process as follows:

> In or around April 2011, using Debtor's Quickbooks software, I performed a clean up process which consolidated some of the detail contained in my copy of the Quickbooks records for 2009. I am in possession of an archive copy of the Debtor in Possession's Quickbooks records which contain all of the detail which existed prior to performing the clean up process for 2009.

*Affidavit of Denise Duplinski,* submitted with *Amended Application For Authority To Employ Denise Duplinski And Birnbrey, Minsk, Minsk & Perling As Accountants For Debtor In Possession Nunc Pro Tunc To June 8, 2010* (doc. 234). The individual entries were never provided to Schneider despite those entries apparently having been "archived" by Duplinski.

#### H. *Tax Return Issues*

At the Hearing the parties sparred over whether the required tax returns were current for the Debtor. Like the eligibility issue, this issue is clouded by the fact that the Debtor is a trust.

The Trust Agreement provides for the filing of tax returns by the Debtor.[30]

---

**29.** GCCFC Exhibit 44–8.

**30.** GCCFC Exhibit 7—Section 17.1(*l*) ("the Trust will file its own tax returns.").

However, no such tax returns have ever been filed by the Trust. The expert accountant witnesses disputed whether the Trust was a "disregarded entity" according to federal tax law and if, therefore, such a filing were unnecessary, and whether Visicon, Inc.—whose sole shareholder is Meyers—was the only legal entity required to file a tax return. However, even if the Trust is disregarded in contravention of the terms of the Trust Agreement, the fact remains that Visicon, Inc., if it indeed is the proper filing entity, has not filed a tax return for 2010 and 2011. For 2011, the only reason given was that Visicon, Inc. has sought an extension. No explanation was given for the failure to file Visicon, Inc.'s 2010 tax return. Thus, Visicon, Inc., which from the evidence at the Hearing appeared to be the operator of the Hotel, has not filed a tax return since 2009.

## III. Conclusions of Law

### A. Jurisdiction

This court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

### B. Eligibility

■ The first issue which the court must address is the Debtor's eligibility to pursue relief under Chapter 11 of the Bankruptcy Code, which GCCFC raises as a jurisdictional argument. GCCFC argues this court lacks jurisdiction over this case because the Debtor is not eligible as a trust to file Chapter 11. The burden is upon the Debtor to demonstrate eligibility. *Secured Equip. Trust of Eastern Airlines, Inc. v. First Fidelity Bank*, 38 F.3d 86, 89 (2nd Cir.1994). For purposes of this decision, the court assumes that the Debtor is eligible for Chapter 11 relief; however, the court is not issuing definitive conclusions

because the issue is moot in light of the court's dismissal on other grounds.

■ The Debtor's eligibility to pursue relief under Chapter 11 is not a jurisdictional issue, but rather is an issue as to the Debtor's ability to pursue such relief. The court's subject matter jurisdiction, which must always be scrutinized, is not the same as eligibility. *Glance v. Carroll (In re Glance)*, 487 F.3d 317, 321 (6th Cir. 2007) ("the eligibility requirements of § 109(e) create a gateway into the bankruptcy process, not an ongoing limitation on the jurisdiction of the bankruptcy courts."); *Simon v. Amir (In re Amir)*, 436 B.R. 1, 21–22 (6th Cir. BAP 2010) (prepetition credit counseling addresses eligibility, but § 109(h) is not jurisdictional); *Clippard v. Bass*, 365 B.R. 131, 138 (W.D.Tenn.2007) (eligibility to be a debtor is not jurisdictional). *See also In re Estate of the Assignment for the Benefit of Creditors of May*, 405 B.R. 443, 449 (Bankr. E.D.Mich.2008) (declining to determine whether the business trust eligibility question is jurisdictional, but concluding the court had subject matter jurisdiction to determine eligibility); *Andersson v. Security Fed. Savings and Loan of Cleveland (In re Andersson)*, 209 B.R. 76 (6th Cir. BAP 1997) (dismissal for lack of eligibility under § 109(g)(2) not framed as jurisdictional question); *In re Ingram*, 460 B.R. 904 (6th Cir. BAP 2011) (court found clear grounds for dismissal under § 109(h), but did not discuss the issue as a jurisdictional requirement). Thus, irrespective of the Debtor's eligibility to pursue Chapter 11 relief, the court has jurisdiction over this case and the authority to rule on the dismissal and other matters pending before the court.

■ As a trust, the Debtor's eligibility for Chapter 11 relief is dependent upon its being a "business trust." Business trusts are eligible to file Chapter 11 be-

cause they are included in the definition of "corporation" provided by the Bankruptcy Code. 11 U.S.C. § 101(9)(A)(v).[31] *See also* 11 U.S.C. §§ 101(41) (person includes corporation); 109(b) (persons, with certain inapplicable exclusions, may file under Chapter 7); 109(d) (persons, with certain inapplicable exclusions, eligible to file Chapter 7 may file Chapter 11). A business trust is "created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors." *See Brady–Morris v. Schilling (In re Kenneth Allen Knight Trust)*, 303 F.3d 671, 680 (6th Cir.2002). By contrast, trusts "designed merely to preserve the trust res for beneficiaries generally are not business trusts." *Id.* The determination of whether a trust is a business trust is "fact-specific, and it is imperative that bankruptcy courts make thorough and specific findings of fact to support their conclusions" to show the intention of the parties and how the trust operated. *Id.*

GCCFC argues that the Trust is not a business trust. Certain facts revealed at the Hearing do raise reasonable questions about whether the Trust is a business trust. Duvall testified that the Debtor holds only legal title to the ground lease for the Hotel. Further, Duvall opined that the Trust is a disregarded entity for federal tax purposes, and as such, it files no tax returns. All income from the Hotel is instead included in the tax return of Visicon, Inc., a separate corporate entity. In addition, the Trust has no employees and has no separate federal tax identification number. Employees of the Hotel are paid by Visicon, Inc. Thus, there is a reasonable basis to conclude that the Trust merely holds the "res," i.e. the leasehold interest for the Hotel, while all operations of the Hotel are conducted by Visicon, Inc., a non-debtor corporation.

Nevertheless, the court declines to rule upon the eligibility issue because this case is being dismissed for cause and the issue is moot.

## C. Motion for Adverse Inference against the Debtor–in–Possession

During the Hearing, GCCFC orally moved the court to render adverse inferences against the Debtor on account of the Debtor's failure to produce documents requested during discovery. The court ordered the parties to brief this issue as part of the parties' post-hearing memoranda. GCCFC requests the court to find that the requested documentation concerning payments to Chase, American Express, First Bank of Omaha, or Fifth Third Bank was not provided and infer that the documents would show that the expenses were not ordinary and reasonable business expenses of the Hotel, but rather were the personal expenses of the Debtor's insiders.

GCCFC served formal discovery requests upon the Debtor on January 14, 2012 and informal requests on May 24, 2012.[32] In the January requests, GCCFC requested "[a]ll documents concerning any credit card account held by the Debtor, including but not limited to copies of all credit card statements." A similar request was made in May. GCCFC never received any documentation to support business expenses (or personal expenses reimbursed to the Hotel) for the Chase credit cards used by principals and insiders of the Hotel. The Debtor also failed to provide any similar documentation for cards issued by

---

**31.** Unless otherwise noted, all statutory references are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. §§ 101–1532, cited hereinafter in this decision as "§ ____".

**32.** GCCFC Exhibits 48 & 49.

American Express, First Bank of Omaha, and Fifth Third Bank. The undisputed evidence is the requests were made and that the documentation were not provided by the Debtor.

■ Federal Rule of Civil Procedure 37(c)(1)(C) (applicable by Federal Rule of Bankruptcy Procedure 7037) states that "[i]f a party fails to provide information ... the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard ... may impose other appropriate sanctions...."). The adverse inference doctrine provides that if relevant evidence "is in the possession of one party, and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it." *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632–33 (6th Cir.2000); *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 712 (6th Cir. 2007); *Bishop v. Lucent Tech.*, 520 F.3d 516, 522, n. 1 (6th Cir.2008).

■ Based on the undisputed record of the Debtor's non-compliance with discovery concerning the documentation related to the aforementioned credit card expenses, the court finds that the credit cards issued by Chase, American Express, First Bank of Omaha, and Fifth Third Bank were all used for personal expenses that were unnecessary for the Hotel's operations.

**D. This Case Shall Be Dismissed**

■ A bankruptcy court, upon request of a party in interest, shall dismiss or convert a Chapter 11 case for cause, whichever is in the best interest of the creditors and the estate, unless the court determines that the appointment of a trustee or examiner is in the best interests of the creditors and the estate. 11 U.S.C. § 1112(b)(1). Once cause is established, dismissal or conversion is mandatory unless the debtor can meet the elements of the "unusual circumstances" exception. 11 U.S.C. § 1112(b)(2). The court has discretion in determining what constitutes cause, but the Bankruptcy Code provides a non-inclusive list of examples. 11 U.S.C. § 1112(b)(4). The movant bears the burden of showing cause by a preponderance of the evidence. *In re Wahlie*, 417 B.R. 8, 11 (Bankr.N.D.Ohio 2009), *citing In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir.1994). Based upon the evidence admitted at the Hearing, the court finds cause more than ample to dismiss this Chapter 11 case.

**1. *Gross Mismanagement of the Estate and Lack of Transparency and Candor to the Court and Parties***

First and foremost, the Debtor grossly mismanaged this estate's funds. While the Debtor may have managed the Hotel acceptably in its daily operations by increasing occupancy rates and improving its working relationship with the Air Force, the Debtor's failure to justify expenses, comply with financial reporting requirements, and keep accurate accounting records led to a lack of control over estate cash. *See* 11 U.S.C. § 1112(b)(4)(B) ("cause includes ... gross mismanagement of the estate").[33] As detailed above, the

---

**33.** Hostmark was hired by LNR to review the financial status of the Hotel. The Debtor prepared a spreadsheet with financial information in the format Hostmark requested (Debtor Exhibit 39). According to the Debt-

or, it was fully capable of complying with GCCFC's reporting requirements. And yet—ironically—neither this court nor the United States Trustee was ever given any legitimate explanation as to why the Debtor could not

Debtor spent large sums of the estate's cash on the personal expenses of Amanda Meyers, Meyers and Witter—all insiders of the Debtor. Turner was never instructed to question such payments and indeed was ordered to pay these bills by Meyers, whether she could document it as benefitting the Hotel.

■ The payment of pre-petition unsecured creditors also is undisputed. These payments may only be made upon court authorization based upon the equitable doctrine of necessity. *In re Corner Home Care, Inc.*, 438 B.R. 122, 125–28 (Bankr. W.D.Ky.2010). Instead of first seeking court approval, the Debtor paid these creditors post-petition as if the bankruptcy petition never had been filed.[34]

The Quick Books data was proven inaccurate in material aspects and could not be relied upon. The General Ledger for at least 2009 and 2011 was never finalized. Similarly, the monthly operating reports were proven unreliable because they failed to list payments to insiders and produced monthly profit and loss statements based on unfiled and inaccurate balance sheets. The Debtor argues that the Quick Books entries are not the only books and records of the Hotel and that the Debtor also maintained certain paper records and used a "front desk software system to track reservations and financial transactions." However, it was the Quick Books software that Turner used to enter the erroneous information concerning accounts receivable and the classification of personal expenses of management as "automobile" or "trav-

el." Turner had no mechanism to have these funds reimbursed because Meyers and Witter never intended to reimburse the Hotel. There was no evidence from the Debtors justifying the payment of the insiders' personal expenses or the many other problems revealed by Quick Books.[35]

Despite the fact the Debtor did not introduce any meaningful evidence to rehabilitate its books and records, it claims Schneider should have reviewed two years of daily financial information before reaching any conclusions. But the Debtor apparently never reviewed its own paper records and let stand an overwhelming record of gross financial mismanagement of this estate that more than met GCCFC's burden. Indeed, Duvall, the Debtor's own expert, did not review the daily financial records.

The Hotel spent significant funds on costly renovations, such as flat screen televisions and mini refrigerators for each room, but never sought the authorization of the court or GCCFC's consent. The court finds such expenses should have been authorized by the court as reasonable and necessary or approved by GCCFC. Relying upon a statement from committee minutes from a meeting in 2007 that the Air Force required these changes is not credible.

The court is also troubled by the lack of candor and cooperation of the Debtor. While this case was filed by a trust, at no time prior to the Hearing did the Debtor disclose to this court that the Hotel was

comply with the requirements to file complete and accurate monthly operating reports, including balance sheets and disclosures of insider payments.

**34.** The court is troubled by the Debtor's characterization that it merely had "certain lapses in following rules and procedures that govern Chapter 11 proceedings." (doc. 240, p. 18).

**35.** Schneider testified that the General Ledger showed $115,509 as a "write off of uncleared deposits." He was flabbergasted that such a significant amount of cash for a hotel of this size could be unaccounted for and not later found in a reconciliation (*See* GCCFC Exhibit 1 [GCCFC 0541] ).

being operated by Visicon, Inc., a non-debtor entity.[36] The evidence established that no tax returns were filed for the Trust, the Trust had no employees, all of the employees who worked at the Hotel were employees of Visicon, Inc., and the only tax returns filed were those of Visicon, Inc. In essence, the Debtor was an entity that merely held the ground lease for the Hotel, while all other operations were conducted by a nondebtor entity. While the Debtor showed all of the income and expenses of the Hotel on its operating reports, the income and expenses were reported on Visicon, Inc.'s tax returns. This fact—that the Hotel was in fact operated by Visicon, Inc. and not the Debtor—establishes either a lack of candor on the Debtor's part or its ignorance of fundamental management principles, neither of which can be overlooked along with all the other compounding deficiencies.

 In addition, the Debtor's failure to cooperate in discovery reveals that it is not an entity deserving of the protection of and fresh start provided by the Bankruptcy Code. Not only did the Debtor fail to produce the documents requested by GCCFC related to the personal expenses paid by the Hotel for the insiders, the Debtor also failed to provide Schneider and GCCFC with detail for the 2009 Quick Books entries—instead giving him "summaries" of the accounts after the detail was purged by Duplinski. This conduct ignored GCCFC's entitlement to discovery and necessarily curtailed the evidence which could be provided to this court. Even under circumstances when transactions do not appear amiss, such deletion of detail would be disconcerting. Deletion of detail when numerous transactions of a dubious nature have occurred during a debtor's Chapter 11 case is alarming. A paramount requirement of bankruptcy, and particularly as to a Chapter 11 debtor in possession, is disclosure and transparency. As stated in *Sanchez v. Ameriquest Mortgage Co. (In re Sanchez )*:

> The American bankruptcy system is often described as having two primary objectives: first, ensuring the equitable and timely repayment of creditors with valid claims; and second, affording debtors a fresh start once they emerge from bankruptcy. In order for these twin goals to be achieved—indeed, in order for the bankruptcy system to function— every entity involved in a bankruptcy proceeding must fully disclose all relevant facts.

372 B.R. 289, 296–97 (Bankr.S.D.Tex.2007) (citations omitted). *See also In re Vaughan*, 429 B.R. 14, 29–30 (Bankr. D.N.M.2010) (same); *In re ARS Analytical, LLC*, 433 B.R. 848, 865 (Bankr. D.N.M.2010) ("accurate disclosure is a fundamental duty of a debtor-in-possession"). It was not for the Debtor or its agents to determine what facts, information or "detail" GCCFC and the court should be provided—full, complete and candid disclosure of all financial information concerning the Chapter 11 debtor in possession is compulsory. Whether it is termed "purging" or "cleaning" of financial information, such conduct in relation to a debtor's financial records cannot be condoned.

2. *Substantial and Continuing Loss or Diminution to the Estate and the Absence of a Reasonable Likelihood of Rehabilitation*

 Closely related to the gross management is the "substantial or continuing

---

36. The Debtor's filings indicate that the Hotel was operated by the Debtor. *See* for example, *Motion for Use of Cash Collateral*, ¶¶ 5 & 9 (doc. 49) and *Debtor's Motion for an Order Extending Debtor's Exclusive Periods to File and Solicit Acceptances*, ¶¶ 6 & 7 (doc. 51). Indeed, the *Debtor's Post–Hearing Proposed Findings of Facts, Proposed Conclusions of Law and Law and Argument* continues to make this assertion. Doc. 240, p. 1, ¶ 1.

loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation [.]" As explained, the Debtor's management spent estate funds on personal expenses as a routine matter. Such expenditures continued for the entire period for which the court had evidence, and the cash wasted was significant. The court agrees with the UST's conclusion that the management of the Hotel has shown it lacks both the competence and the inclination to remedy the systemic errors and that these losses and wasting of assets would only continue. Were this case not being dismissed, the court would wholeheartedly agree with the UST's alternative remedy of appointing a Chapter 11 Trustee. *See* 11 U.S.C. § 1104(a)(1).

The Debtor claims there is no evidence of substantial or continuing loss because the Debtor made the agreed upon adequate protection payments, upgraded the Hotel, paid its post-petition taxes,[37] and generated almost $10,000,000 in revenue. But Meyers, Amanda Meyers and Witter wasted over $120,000 in cash on personal expenses through credit cards alone. Car lease payments and funds spent on a Florida condominium drained cash as well. In addition, due to accounting errors such as the *account receivable tub* the evidence showed that the Debtor cannot or will not keep track of its generated cash in an acceptable manner. The losses proven are substantial and the Hearing provided ample reason to believe it would only continue. The lack of disclosure in the monthly operating reports and unfiled post-petition tax returns raises further concern.

Furthermore, an absence of a reasonable likelihood for rehabilitation exists. The Debtor argues it has worked with its employees, contractors, vendors, guests and the Air Force. However, the Debtor has not provided the necessary financial disclosure to the court, the UST or GCCFC. Such disclosure would be a predicate to this court approving any disclosure statement and plan of reorganization. The court has little confidence helpful change will occur in the future given that the serious errors during the bankruptcy have never been addressed.

### 3. *Unauthorized Use of Cash Collateral Substantially Harmful to One or More Creditors*

██ The Debtor's repeated use of GCCFC's cash collateral without authorization to GCCFC's substantial detriment is additional cause for the dismissal of this case. *See* 11 U.S.C. § 1112(b)(4)(D) (cause includes the "unauthorized use of cash collateral substantially harmful to one or more creditors."); *In re SI Grand Traverse LLC,* 450 B.R. 703, 709 (Bankr. W.D.Mich.2011). The Debtor never had GCCFC's consent nor the court's authorization to use cash collateral except for ordinary and reasonable business expenses and, as detailed, the Debtor frequently used the cash collateral for other purposes. The Debtor argues that, while it undeniably used cash collateral for improper purposes, GCCFC did not suffer any harm, much less substantial harm, from its unauthorized use of cash collateral because the Debtor made each and every adequate protection payment. For the reasons discussed below, the court disagrees.

██ Code § 363(c)(2) provides that a trustee[38] may not use cash collateral unless each entity which has an interest in that cash collateral consents or the court,

---

**37.** The Debtor concedes post-petition taxes were not always current, but the evidence showed such payments were current as of the Hearing.

**38.** When a trustee has not been appointed, a debtor in possession generally has the rights of a trustee. *See* 11 U.S.C. § 1107(a).

after notice and hearing, authorizes such use.[39] The Debtor has conceded that the Hotel revenues constitute GCCFC's cash collateral and that it engaged in the unauthorized use of cash collateral, but argues that GCCFC did not suffer any harm from that unauthorized use.

The Debtor and GCCFC never entered into a cash collateral agreement memorialized into an order.[40] Notwithstanding the lack of an order authorizing the use of cash collateral, the parties agreed that cash collateral could only be spent on ordinary and necessary estate expenses unless GCCFC consented to, or the court authorized such other use. The Debtor, through payment of the credit card bills containing numerous charges for the insiders' personal expenses and through payment of other unnecessary expenses violated the agreement repeatedly. In multiple examples, the Debtor's management could not even explain why certain charges were paid and how, if it all, the charges related to the Hotel. In some instances, such as the First Bank of Omaha credit card, the charges could not even be identified. In addition, professionals were paid funds with little benefit to the estate shown.

Although a relief from stay motion is not pending, the Debtor argues that the adequate protection payments are more than sufficient under the relief from stay stan-dard for secured creditors in single asset real estate cases. *See* 11 U.S.C. § 362(d)(3). Further, although GCCFC disputes this assertion, the Debtor further argues the adequate protection payments are sufficient to protect GCCFC's undersecured status. However, regardless of the "sufficiency" of the amount of the adequate protection payments, adequate protection does not justify the impermissible use of the GCCFC's cash collateral.[41]

 The Debtor's argument also obfuscates the distinction between adequate protection under § 363(e) and the use of cash collateral under § 363(c)(2). While motions to use or to prohibit the use of cash collateral are frequently filed contemporaneously with motions seeking relief from the automatic stay of § 362(a) (and sometimes, in the alternative, for adequate protection), adequate protection and use of cash collateral are different, but sometimes overlapping, concepts. Adequate protection under § 363(c) protects a secured creditor from diminution in the value of the creditor's collateral resulting from or during the debtor's use of the collateral during the pendency of the bankruptcy case or bankruptcy stay. *See In re Cardinal Congregate I*, 113 B.R. 371, 375 (Bankr.S.D.Ohio 1990). For example, a car lender may receive payments during the bankruptcy representing the diminu-

---

**39.** Code § 362(a) defines "cash collateral."

**40.** Both the Debtor and GCCFC ran great risks in failing to agree in writing upon the scope of the Debtor's authority to use cash collateral. However, while the use of monthly budgets and a formal cash collateral order certainly would have removed some ambiguity, such as what Hotel maintenance, improvements, and renovations were permitted, the use of the cash collateral to pay personal expenses do not fall into any gray area. Further, to the extent that ambiguity existed as to what are reasonable operating expenses, case law provides guidance and examples. *See In*

*re Willowood East Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 144 (Bankr.S.D.Ohio 1990).

**41.** Further, even if a relief from stay motion were pending, which is not the case, the rights granted to a lender under § 362(d)(3) are not the exclusive basis for granting relief from stay to a secured lender in a single asset real estate case. *Norton Bankruptcy Law and Practice* Third Ed., Volume 2, § 43.48, 43–106 ("[T]he rights granted in Code § 362(d)(3) are in addition to, not in lieu of, other grounds for relief from the automatic stay.").

tion in the value of the car while the debtor uses the car during the bankruptcy. Use of cash collateral is controlled by § 363(c)(2) and is limited to use as either consented to by the secured creditor or authorized by the court. Even if the Debtor and GCCFC characterized the $50,000 payments made by the Debtor to GCCFC as "adequate protection payments," any such characterization or agreement could not authorize cash collateral to be used for nonoperating expenses when the express agreement was to the contrary.[42] The making of the $50,000 monthly payments to GCCFC did not give the Debtor license or authority to use the remaining cash collateral for any purpose which the insiders desired, especially when GCCFC limited its use to ordinary and reasonable expenses incurred in operating the Hotel.

There seems to be little case law discussing when unauthorized use of cash collateral is "substantially harmful" to one or more creditors. "Substantial" is defined as "considerable in importance, value, degree, amount, or extent." *The American Heritage Dictionary* 1376 (4th ed. 2007). The Debtor's unauthorized use of cash collateral to pay the numerous personal expenses of the insiders, to pay prepetition claims, to make unauthorized payments to professionals, to make mortgage and condominium association payments on Ms. Witter's Florida condominium, to make the lease payments on Ms. Witter's, Angela Meyers', and Meyers' automobiles, and the payment of expenses for which no explanation was given unequivocally rises to a level of being "considerable in importance, value, degree, amount, or extent." Even giving the Debtor credit for the renovations and upgrades to the Hotel, all the other cash spent on unnecessary personal expenses and unauthorized professionals were without any shown benefit to the estate and is no longer available to pay GCCFC's secured claim or for other purposes. Non-priority unsecured creditors were paid in complete derogation of the bankruptcy priority scheme. No evidence was presented to establish the appropriateness or legal justification for these payments.

Accordingly, the court finds that cause exists to dismiss this case based upon the Debtor's unauthorized use of cash collateral that was substantially harmful to GCCFC and to any unpaid unsecured creditors.

---

**42.** Secured lenders, such as GCCFC, frequently consent to the use of cash collateral to pay the ordinary, necessary, and reasonable operating expenses of a business, such as the Hotel, and courts frequently authorize such usage of cash collateral under § 363(c)(2)(B) because use of the cash collateral for those purposes maintains the total value of the bundle of collateral and rights which a secured lender with a blanket lien on the debtor's assets holds. Thus, use of the cash collateral for such purposes maintains the going concern value of the business, maintains the goodwill of the business, allows for preservation and maintenance of the physical collateral, and allows for replacement of that cash collateral with new replacement cash collateral. *See In re Willowood East Apartments of Indianapolis II, Ltd.,* 114 B.R. 138, 144 (Bankr.S.D.Ohio 1990) and *In re Murray,* 2011 WL 5902623 (Bankr.E.D.N.C. May 24, 2011). In such cases, the "net rents," i.e. the rents or revenues in excess of the normal and reasonable operating expenses, are paid to the secured lender holding the interest in the cash collateral, with the courts finding that use of the gross rents or revenues to pay the operating expenses, with the net rents or revenues paid to the secured creditor adequately protects the secured creditor's interests in the cash collateral. *See Willowood,* 114 B.R. at 143–44 and *In re Cardinal Congregate I,* 113 B.R. 371, 376 (Bankr.S.D.Ohio 1990). Use of cash collateral to pay personal expenses of insiders and other improper expenses such as the unauthorized professional payments does not serve to maintain or enhance a secured lender's collateral or bundle of rights.

### 4. Unexcused Failure to Timely Satisfy Filing or Reporting Requirements

 Finally, the monthly operating reports were proven both inaccurate and incomplete. The purpose of the operating reports is to provide the parties in interest, the UST and the court with meaningful financial information with which to gauge the debtor's performance. The Debtor's failure to file a balance sheet as part of these reports significantly diminished the value of those reports. The Debtor did not even attempt to explain its failure to produce and file a balance sheet during its two-year period in bankruptcy beyond vague testimony provided by Meyers which seemed to center upon whether the funds used to purchase Meyers' ex-spouse's interest in the Trust should be booked as a receivable. The court cannot blindly accept the statement that "[b]alance sheets are under review by the CPA and will be supplemented at a later date." Perhaps this statement would suffice for a few months while the debtor got its financial affairs in order; but two years of such statements is inexcusable. Further, as explained by Schneider, the profit and loss statements are unreliable. Significant and repeated payments to insiders went undisclosed. All of these facts further justify dismissal for cause. *See* 11 U.S.C. § 1112(b)(4)(F) (cause includes the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter[.]").

In isolation, perhaps these issues might be understood as innocent omissions or errors. It is not uncommon for debtors' financial records to be in shambles when they file bankruptcy. However, given the circumstances, including the failure to file post-petition tax returns, and the numerous questionable financial transactions, the court finds cause to dismiss this case as a result of the Debtor's failure to comply with the basic financial disclosure requirements for a debtor-in-possession.

### 5. No "Unusual Circumstances" Exist to Avoid Dismissal

The Debtor argues that, even if the court finds cause for dismissal, the court should find that "unusual circumstances" and the best interests of creditors and this estate militate in favor of allowing this case to continue. The court disagrees.

 Section 1112(b)(2) provides that:
(2) The court may not convert a case under this chapter to a case under chapter 7 . . . or dismiss a case under this chapter . . . if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title . . ., or if such sections do not apply, within a reasonable period of time; and
(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
 (i) for which there exists a reasonable justification for the act or omission; and
 (ii) that will be cured within a reasonable period of time fixed by the court.

In order to avoid dismissal or conversion, the court must find: a) "unusual circumstances," b) that those unusual circumstances establish that the best interests of creditors and the bankruptcy estate are served by allowing the case to continue in Chapter 11; c) that there is a reasonable

likelihood that a plan of reorganization will be confirmed for the Debtor within a reasonable period of time; d) that the grounds for converting or dismissing include an act or omission other than for substantial or continuing loss to or diminution of the estate; and e) that the act or omission will be cured within a reasonable time period. The court does not find a single one of these five elements present, let alone all five.

■ The court has determined that cause exists pursuant to § 1112(b)(4)(A) and, therefore, the unusual circumstances exception does not apply. Even if it did, the court finds multiple grounds for dismissing this case for acts and omissions for which no reasonable justification has been provided. There is no reasonable justification for the inadequate monthly operating reports, the payment of pre-petition unsecured debt without court authorization, the retention and payment of professionals without court authorization, and the failure to schedule significant assets owed by insiders to the Debtor. The court has not been provided any evidence that suggests these violations will be cured with a reasonable time.

■ Additionally, the court does not find any "unusual circumstances" in this Chapter 11 case. While it is true the Hotel's location and legal relationship with the Air Force is unique, the court agrees with the UST that the Debtor's management is not uniquely qualified to administer this Hotel. In fact, the record has proven that management is not qualified to administer the financial responsibilities of a Chapter 11 debtor-in-possession or run the Hotel. The court also finds the evidence does not support the contention that survival of the Hotel is more likely achieved by continuing this Chapter 11. Although a plan has been proposed, the mere filing of a proposed plan of reorgani-

zation does not portend confirmation. The other salient point is that the continuation of this Chapter 11 case is not in the best interest of the creditors. GCCFC seeks another forum and the Debtor's schedules and other evidence show there are likely no other significant creditors to benefit from this case.

6. *Dismissal Rather Than Conversion of this Chapter 11 Case to Chapter 7 is Appropriate*

■ The court has the discretion to dismiss this case or convert it to Chapter 7, whichever is in the best interests of the estate and the creditors. The UST and GCCFC both seek dismissal. In deciding whether it is in the best interests of creditors to dismiss rather than convert a bankruptcy case, the court gives some deference to the UST's recommendation since such recommendations are within the core responsibilities of the UST. This case is a single asset real estate case with an undersecured lender with a blanket lien on all of the Debtor's assets, and few other creditors exist. Accordingly, the court finds that dismissal, rather than conversion, is appropriate.

7. *Based Upon the Findings and Conclusions in this Decision, The Prohibition of the Use of Cash Collateral is Appropriate*

Even if dismissal were not appropriate in this instance, the court would deny the Debtor's motion to use cash collateral and grant GCCFC's motion to prohibit its use.

■ As previously detailed, the Debtor repeatedly used GCCFC's cash collateral for nonordinary and unnecessary expenses, some of which were undisclosed supplemental income for insiders. Section 363(c)(2) states that "[t]he trustee may not use ... cash collateral under paragraph (1) of this subsection unless ... each enti-

ty that has an interest in such cash collateral consents; or ... the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." "A creditor who complains of a violation of § 363(c)(2) must establish that such a violation has resulted in harm to the creditor." *In re Schwartz,* 213 B.R. 695, 698 (Bankr.S.D.Ohio 1997).

To repeat one particularly egregious example of the unauthorized use of cash collateral, Amanda Meyers received over $58,000 in goods and services from the Hotel's cash, despite the fact, as an individual with no role at the Hotel whatsoever, it is indefensible that she was even issued a credit card. Even if dismissal of this case were not warranted—and the systematic unauthorized use of cash collateral in violation of § 363(c)(4) alone justifies it—the court finds the motion to prohibit cash collateral should be granted. The multitude of unapproved and unjustified expenditures need not be repeated.

 The court has discretion in how it remedies the unauthorized use of cash collateral. In this instance, the unauthorized use warrants dismissal pursuant to § 1112(b)(4)(D) and no further remedy is requested. Now, at the eleventh hour, the Debtor argues it has provided adequate protection and will stay within its budget (with a 10 percent variance). The dismissal has little to do with adequate protection, although that is often a crucial issue in single asset real estate reorganization. From the narrow view of GCCFC's claim, the substantial failure to preserve a lender's cash collateral pursuant to the parties' agreement is not cured by adequate protection going forward. The Debtor has not offered to replace the cash collateral that it has already improperly dissipated through improper payments. The maintenance of an undersecured lender's lien position, while important for adequate pro-

tection analysis, does not justify wasting cash collateral. If the business is improving, the cash collateral generated should either improve GCCFC's position or otherwise be spent by consent of GCCFC or, over its objection, by court order. Maintaining an undersecured creditor's lien position is not a green light to spend funds without the creditor's consent or the court's authorization.

Setting aside the impact upon GCCFC from the improper use of cash collateral, the court cannot turn a blind eye to the expenditure of cash collateral on specific items that required court authorization and the lack of transparency in the Debtor's books and records. Against the record presented, the court has no confidence current Hotel management has the inclination to address all these issues. The account receivable tub, the Chase credit card, the other unexplained credit cards, the lack of current tax returns, and accounting errors are some of the issues that have not been cured. The Debtor seemed unable even to acknowledge many of these problems and had little to offer in terms of solutions. The Debtor's management can no longer be trusted with the cash of this estate or the cash collateral of GCCFC.

For all these reasons, the motion to prohibit the use of cash collateral is granted and the motion to use cash collateral is denied.

8. *The Retention Application, As Amended, for the Proposed Accountant for the Debtor–in–Possession is Denied*

On May 25, 2012 the Debtor filed an application to employ Denise Duplinski and Birnbrey, Minsk, Minsk & Perling as accountants retroactive to June 8, 2010 (doc. 164). An objection was filed by the UST (doc. 170) and GCCFC (doc. 173). The Hearing was set to be heard concurrently with the motion to dismiss and the

motion to prohibit cash collateral. However, by agreement of the parties, the initial application was denied without prejudice. An amended application (the "Birnbrey Application") was filed on July 13, 2012 (doc. 234). Renewed objections have been filed by the UST and GCCFC (docs. 235 & 236).

The Birnbrey Application indicates that Duplinski and the Birnbrey firm have provided post-petition services "including but not limited to preparation, updates, and revisions to a spreadsheet template providing extensive detail on financial information relating to the Debtor in response to discovery requests by a creditor. . . . Birnbrey also provided support related to additional discovery requests that Debtor provide electronic Quickbooks software, general ledger, and other financial information. In addition, Birnbrey has provided updates and corrections related to Debtors books and records, and responded to a subpoena related to bankruptcy proceedings of Debtor." The Birnbrey Application also indicates that Birnbrey will assist in preparing balance sheets back to June 2010 and will prepare tax returns for Visicon, Inc. once the balance sheets are completed. The affidavit discloses all of Birnbrey's post-petition invoices have been paid in full, with these invoices attached to the Application.

 The court finds the Birnbrey Application should not be approved retroactive to June 8, 2010. Further, assuming this case was not being dismissed, the court finds the record cannot support retaining Birnbrey prospectively. Finally, all fees paid to Birnbrey postpetition were in blatant disregard of both the cash collateral agreement with GCCFC, the Bankruptcy Code, and admonitions from the court concerning the retention and payment of professionals. Accordingly, all compensation paid to Birnbrey shall be disgorged and returned to GCCFC through Debtor's counsel.

 The Debtor has not articulated any reason for the court's retroactive retention of Birnbrey going back two years. However, the prevailing standard for retroactively appointing professionals is not even a plain "cause" standard, but rather, requires that exceptional circumstances be proven by clear and convincing evidence. *See In re Aultman Enterprises,* 264 B.R. 485, 492–94 (E.D.Tenn.2001). Despite the need for the court's approval of Birnbrey's retention being raised by both the court and GCCFC, the Debtor, ignoring the clear requirements of the Bankruptcy Code under 11 U.S.C. §§ 327(a), 330, and 331 and Federal Rules of Bankruptcy Procedure 2014 and 2016, paid Birnbrey—similarly to other professionals—as if the bankruptcy never occurred.

 In *Aultman* the court listed nine factors which a court may consider in determining whether to retroactively appoint a professional:

1. The debtor, trustee, or committee expressly contracted with the professional to perform the services which were thereafter rendered;

2. The party for whom the work was performed approves the entry of the nunc pro tunc order;

3. The applicant has provided notice of the application to creditors and parties in interest and has provided an opportunity for filing objections;

4. No creditor or party in interest presents a reasonable objection to the entry of the nunc pro tunc order;

5. The professional satisfied all the criteria for employment pursuant to 11 U.S.C. § 327 and Rule 2[014] of the Federal Rules of Bankruptcy Procedure at or before the time services were actually commenced and re-

mained qualified during the period for which services were provided;

6. The work was performed properly, efficiently, and to a high standard of quality;

7. No actual or potential prejudice will inure to the estate or other parties in interest;

8. The applicant's failure to seek pre-employment approval is satisfactorily explained; and

9. The applicant exhibits no pattern of inattention or negligence in soliciting judicial approval for the employment of professionals.

*Id.* at 492, *citing In re Twinton Properties P'ship*, 27 B.R. 817, 819–20 (Bankr. M.D.Tenn.1983).

Almost none of the factors cited in *Aultman* apply. The work was not expressly contracted through any employment agreement and the key work of preparing balance sheets and tax returns was never done. The court lacks sufficient evidence that Birnbrey is qualified to complete the work and that the work has been done properly, efficiently or to a high standard of quality. The court finds that retroactively retaining Birnbrey would impair GCCFC's security interest and the UST's interest in protecting the integrity of the bankruptcy system. The failure to seek retention promptly has not been satisfactorily explained and, in fact, it has not been explained at all. Finally, the Debtor has exhibited a clear pattern of inattention and neglect in seeking judicial approval of the employment of professionals.

Further, the court cannot ascertain any meaningful benefit which the unauthorized employment of Birnbrey has provided to this estate. The Quick Books remain unreliable and in a mystery that apparently will remain unsolved, Birnbrey has never prepared the needed balance sheets, and, even at this late date, the court is expected

to believe the balance sheets will be completed. Further, 2010 and 2011 tax returns have never been prepared for Visicon, Inc. and the Trust files no tax returns. Incredibly, the Birnbrey Application explains that the required post-petition tax returns have not been filed because the balance sheets have not been prepared (doc. 234, ¶ 14).

The court finds the invoices listing the unauthorized work and payments lack the required specificity, including detail as to the services provided on each date of service and a breakdown of the services into appropriate billing increments. Since no balance sheets have been prepared after two years, the court finds any work related to the balance sheets had a negligible benefit to the estate at best. Similarly, work related to the 2010 tax return is difficult to quantify since the return is not being prepared for the Trust and, in any event, has never been filed.

The Application to retain Birnbrey, as amended, is denied. All unauthorized postpetition payments to Birnbrey shall be disgorged to GCCFC through Debtor's counsel.

## IV. Conclusion

Chapter 11 allows a debtor to reorganize its business and financial affairs through a plan of reorganization or through the orderly liquidation of its assets, giving the debtor the opportunity to do so as a result of the breathing spell provided by the automatic stay. In return, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure require a debtor-in-possession to disclose its assets and liabilities and follow the substantive law and procedural rules governing Chapter 11 cases. Once a Chapter 11 case is filed, the business of the debtor can no longer be conducted "as usual." Limits and restrictions are im-

posed by the Code and Rules on the debtor's operations for the protection of the debtor's creditors and parties-in-interest. In addition, bankruptcy under any chapter of the Code demands disclosure, transparency and candor.

This Debtor, despite voluntarily choosing the forum of the bankruptcy court, has failed to comply with the burdens and requirements imposed upon it under Chapter 11. Therefore, for all the reasons enumerated, GCCFC's motions to dismiss and to prohibit the use of cash collateral are **granted.** The Debtor's motion to use cash collateral is **denied.** The motion to retain Birnbrey retroactive to the petition date is **denied.** All unauthorized fees paid to Birnbrey shall be disgorged to GCCFC through Debtor's counsel. The court will concurrently issue orders consistent with this decision.

**IT IS SO ORDERED.**